07 CV 3715

Judge Hellerstein

AMY J. GREER
KINGDON KASE
TAMI S. STARK (TS-8321)
COLLEEN K. LYNCH
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Philadelphia Regional Office
701 Market Street
Suite 2000
Philadelphia, PA  19103
Telephone: (215) 597-3100
Telefax: (215) 597-2740

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION, :
:
       Plaintiff, :
:
       v. :
:
JENNIFER XUJIA WANG, and :
RUBEN a/k/a RUOPIAN CHEN, :    Civil Action No.
:
       Defendants, :
:
       and :
:
ZHILING FENG, :
:
       Relief Defendant. :
:

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND ORDER FREEZING ASSETS AND GRANTING OTHER RELIEF

The Securities and Exchange Commission (the "Commission") respectfully submits this memorandum in support of its *Ex Parte* Application for a Temporary Restraining Order, Preliminary Injunction, and Order Freezing Assets and Granting Other Relief (the "Application")

against defendants Jennifer Xujia Wang ("Wang") and Ruben a/k/a Ruopian Chen ("Chen") (collectively, "Defendants"), and relief defendant Zhiling Feng ("Feng"). The Application and the Commission's Complaint in this matter are necessary because the assets that are the subject of this action are in jeopardy of being dissipated and, as to Defendants Chen and Wang, there exists a risk of flight from the jurisdiction.

## I.    PRELIMINARY STATEMENT

The Commission seeks this immediate and *ex parte* relief because there is a strong possibility that the Defendants, who are citizens of the Peoples Republic of China ("China"), and relief defendant Feng, who is a citizen of China residing in Beijing, may attempt to move the proceeds of their fraudulent scheme offshore, outside the jurisdiction of the United States courts, once they are notified of this action. In addition, in the case of Defendants Chen and Wang, there exists a risk of flight from the jurisdiction. Under the circumstances, it is imperative that the proceeds be maintained in the United States in the event that they ultimately are needed to satisfy a final judgment against the Defendants and relief defendant Feng. Accordingly, by its Application, the Commission seeks, among other relief, a freeze of those proceeds. Such a freeze will merely preserve the *status quo*, and will not cause the Defendants or relief defendant Feng any substantial harm, pending the Court's determination of the Commission's request for injunctive relief.

## II.    FACTUAL SUMMARY

From at least December 2005, and continuing through the present, Defendants have engaged in fraudulent insider trading. Through online brokerage accounts in Feng's name, Defendants bought securities of at least three companies prior to public announcements that the companies would be acquired. Wang had material nonpublic information concerning these

pending acquisitions through her employer, Morgan Stanley & Co., Inc. ("Morgan Stanley"), which was contacted to provide services in connection with the acquisitions. Defendants traded on the basis of the material nonpublic information Wang received or accessed concerning these pending acquisitions, including: Morgan Stanley Real Estate's December 19, 2005 announcement of its acquisition of Town and Country Trust; Morgan Stanley Real Estate's August 21, 2006 announcement of its acquisition of Glenborough Realty Trust; and Formation Capital, LLC and JER Partners' January 16, 2007 announcement of its agreement to acquire Genesis HealthCare Corporation. This trading yielded them profits of over $600,000.

## III.    STATEMENT OF FACTS[1]

### A.    Background

#### 1.    The Defendants

a.    **Ruben a/k/a Ruopian Chen**, age 34, is a citizen of China, who currently resides in Queens, NY. (Koster Decl. ¶¶ 5, 9) From approximately July 18, 2005, until March 17, 2007, Chen was employed by ING Investment Management ("ING") in New York, NY, as a Vice-President of the Fund of Funds department and the head of relative value hedge fund strategies. (Koster Decl. ¶ 5) On March 17, 2007, in response to ING's request that Chen cooperate with the firm's internal investigation of Chen's trading, Chen refused to cooperate and resigned. (Koster Decl. ¶ 5)

b.    **Jennifer Xujia Wang**, age 31, is a citizen of China currently residing in Queens, NY. (Koster Decl. ¶¶ 7, 9) She is marred to Chen. (Koster Decl. ¶ 6) Since August 29, 2005, Wang has been employed by Morgan Stanley as a Vice-President in a group referred to as

---

[1]    The facts set forth below are taken from the Declaration of Daniel K. Koster, a staff accountant in the Commission's Enforcement Division ("Koster ¶ ____").

the Valuation Review sub-department, which itself was a sub-department of the Financial Control department in the Finance Division. (Koster Decl. ¶ 7)  In her position as Vice-President and manager of the Securitized Product Group, Wang managed financial analysts responsible for valuing certain assets of the Principal Transaction Group. (Koster Decl. ¶ 12)  On February 21, 2007, Wang, who is pregnant, alerted Morgan Stanley of her intention to seek medical disability and go on bed rest. (Koster Decl. ¶ 8)  On March 14, 2007, in response to Morgan Stanley's request that Wang cooperate with its internal investigation, Wang refused to cooperate and alerted Morgan Stanley of her intention not to return to work following the birth of her child. (Koster Decl. ¶ 8)

       c.    **Zhiling Feng**, age 59, is a citizen of China residing in Beijing, China.  She is Wang's mother. (Koster Decl. ¶¶ 10, 11)

    2.    <u>**Other Unrelated Entities**</u>

       a.    **Genesis HealthCare Corporation ("Genesis")**, headquartered in Kennett Square, Pennsylvania, is one of the nation's largest long-term care providers with nursing centers and assisted living residences in 13 states. (Koster Decl. ¶ 32)  Its stock is traded on the NASDAQ under the symbol "GHCI."  During 2006, trading volume in Genesis averaged 203,000 shares per day and the stock price averaged $45. (Koster Decl. ¶ 31)

       b.    **Glenborough Realty Trust ("Glenborough")**, headquartered in San Mateo, California, is a real estate investment trust, which is focused on owning high quality, multi-office properties concentrated in Washington, DC, California and Northern New Jersey. (Koster Decl. ¶ 51)  Its stock was traded on the New York Stock Exchange under the symbol "GLB." (Koster Decl. ¶ 50)  Before the acquisition in 2006, trading volume in Glenborough averaged 276,401 shares per day and the stock price averaged $20.61. (Koster Decl. ¶ 51)

c.    **Town and Country Trust ("Town and Country")**, headquartered in Baltimore, Maryland, is a real estate investment trust that owns and operates apartment communities in the mid-Atlantic states and Florida.  (Koster Decl. ¶ 62)  Its stock was traded on the New York Stock Exchange under the symbol "TCT."  (Koster Decl. ¶ 62)  In the six months prior to the announcement, on December 19, 2005, that a group led by Morgan Stanley had agreed to buy the company, its stock traded mostly in the $27 to $31 range with average volume of 73,000 shares a day.  (Koster Decl. ¶ 62)

**B.    Defendants' Fraudulent Scheme**

**1.    Wang Had Access to Material Nonpublic Information.**

Because Morgan Stanley owed a duty to maintain the confidentiality of information provided to Morgan Stanley by its clients, in its policies and procedures distributed to employees, Morgan Stanley included policies and procedures mandating that each employee maintain in strict confidence information concerning Morgan Stanley's clients.  (Koster Decl. ¶ 13)  In addition, Morgan Stanley's policies prohibited employees from using confidential information obtained during the course of employment when trading in their own account, or someone else's account.  (Koster Decl. ¶ 13)  As part of her employment application, Wang certified that she would abide by these policies and procedures.  (Koster Decl. ¶ 13)

The Principal Transaction Group, which Wang supported in her position at Morgan Stanley, provides money to potential acquirers of commercial real estate assets by securitizing pools of loans.  (Koster Decl. ¶ 14)  Such potential acquirers of commercial real estate assets include Morgan Stanley Real Estate, real estate investment trusts, and private equity firms.  (Koster Decl. ¶ 14)

As part of Wang's duties she had access to information disseminated to the Global Large Loan Committee ("GLLC") at Morgan Stanley. (Koster Decl. ¶ 15) Wang was added to the electronic mail distribution list for the GLLC on October 11, 2005. (Koster Decl. ¶ 15) Information on the prospective deals evaluated by the GLLC group is tightly restricted. (Koster Decl. ¶ 17) Wang was the only member of her unit with access to the information; not even her supervisor had access to the information. (Koster Decl. ¶ 17)

The GLLC evaluates and approves large loans, including those involving certain transactions related to purchases made by Morgan Stanley Real Estate, real estate investment trusts, and private equity firms. (Koster Decl. ¶ 15) The GLLC periodically sent documents via electronic mail to employees with approved access, including Wang, that included information on deals they were considering, in the form of meeting agendas and meeting minutes. (Koster Decl. ¶ 18) In particular, Wang received minutes reflecting the project names for deals, detailed descriptions of the companies to be acquired, the amounts of the loans, and whether GLLC had approved the loans. (Koster Decl. ¶ 19) Upon receiving meeting minutes reflecting that the loans had been approved, Wang knew that the deals were imminent. (Koster Decl. ¶ 19) Two of the deals the GLLC considered were Town and Country and Glenborough. (Koster Decl. ¶ 20)

As part of her job duties, Wang also was granted access to a shared folder on Morgan Stanley's network drive called "Big loan," and to a subfolder called "Gazelle." (Koster Decl. ¶ 21) Access to these folders was restricted and Wang needed permission to obtain access because the "Big loan" folder contained information about pending loans for acquisitions and projects. (Koster Decl. ¶ 21) The "Gazelle" subfolder contained information and analysis for the Genesis transaction. (Koster Decl. ¶ 22) Wang was granted access to these folders on October 26, 2006. (Koster Decl. ¶ 23)

2.    **Chen and Wang Exercised Control Over Feng's Brokerage Accounts.**

On February 2, 2004, an online brokerage account at Scottrade, Inc. was opened in the name of "Zhiling Feng" ("Feng Scottrade Account"). (Koster Decl. ¶ 25) There were only two deposits to the Scottrade account: the first was the initial deposit of $40,000 to open the Scottrade account in March 2004; and the second was a deposit of $50,000 in March 2005. (Koster Decl. ¶ 25) Both deposits were made by check. Scottrade only possessed a copy of the first check, which was from a Bank of China bank account held by Chen and Wang in a New York, New York, branch. (Koster Decl. ¶ 25)

In the account opening application, Feng was identified as living in Beijing, China, "retired," with an estimated net worth of $500,000 and an annual income of $10,000. (Koster Decl. ¶ 26) The application stated that Feng had at least 8 years experience trading options and 10 years trading stocks. (Koster Decl. ¶ 26)

On May 5, 2006, an online brokerage account at Interactive Brokers, LLC ("Interactive") was opened in the name of "Zhiling Feng" ("Feng Interactive Brokers Account") (Koster Decl. ¶ 27) In June 2006, the Scottrade account was liquidated, and $27,626 in cash and $107,275 in equities were transferred to the Feng Interactive Brokers Account. (Koster Decl. ¶ 29) This was the only deposit made to the Feng Interactive Brokers Account. (Koster Decl. ¶ 29) Documents provided by Interactive Brokers show a facsimile number from which the account opening documents for the Feng Interactive Brokers Account were faxed to Interactive Brokers. (Koster Decl. ¶ 28) Morgan Stanley has confirmed that the facsimile number on the Feng Interactive Brokers Account opening documents matches a fax machine on the floor where Wang works at Morgan Stanley. (Koster Decl. ¶ 28)

Interactive Brokers keeps a log of the Internet Protocol ("IP") addresses of the computers that accessed the Feng Interactive Brokers Account. (Koster Decl. ¶ 30) An IP address individually identifies a computer or network. (Koster Decl. ¶ 30) Many of the Interactive Brokers computer access logs show that the Feng Interactive Brokers Account was accessed from IP address 208.252.25.30, which is an IP address for ING Furman Selz Asset Management, now known as ING Investment Management, Chen's employer. (Koster Decl. ¶ 31)

ING keeps a log of computer use by their employees which shows that Chen accessed Interactive Brokers' website on dates and times that correspond to the dates and times the Feng Interactive Brokers Account was accessed. (Koster Decl. ¶ 32)

Based on the Interactive Brokers' access log, other computers used to access the Feng Interactive Brokers Account have IP addresses that originate from New Jersey, from other locations in New York City, and from hotels such as the Palace in San Francisco and the Ritz Carlton in Naples, Florida, which were locations to which Chen was traveling at the time of the account access. (Koster Decl. ¶¶ 33, 34) In addition, Cablevision, an internet service provider associated with the New Jersey IP address, confirmed that a computer connected to Chen's home in New Jersey was used to access the Feng Interactive Brokers Account. (Koster Decl. ¶ 35)

Chen and Wang did not disclose to their employers that they used or controlled the Feng accounts. (Koster Decl. ¶ 81) ING required Chen to disclose all brokerage accounts in which he could buy or sell securities. (Koster Decl. ¶ 82) Similarly, Morgan Stanley required Wang to disclose any brokerage accounts in which she had a financial interest. (Koster Decl. ¶ 83) Although both Wang and Chen disclosed to their employers that they had accounts away from their employers in Chen's name, they did not disclose the Feng accounts. (Koster Decl. ¶¶ 82,

83) Further, ING required Chen to pre-clear any trading and he did not pre-clear the trades in either the Feng Interactive Brokers Account or the Feng Scottrade Account. (Koster Decl. ¶ 82)

### 3. Wang, Chen and Feng Traded on the Basis of the Material Nonpublic Information Concerning Pending Acquisitions to which Wang was Privy.

Wang, Chen and Feng traded on the basis of the material nonpublic information Wang learned from her employment before at least three acquisitions: Genesis, Glenborough, and Town and Country.

### a. Genesis HealthCare Corporation Trading

Between December 29, 2006 and January 9, 2007, the Feng Interactive Brokers Account purchased a total of 570 "call" option contracts on Genesis at a total cost of $47,705.[2] (Koster Decl. ¶ 42) The Gazelle folder, to which Wang had access on the shared network drive, contained information and analysis showing the Principal Transaction Group's evaluation of Genesis. (Koster Decl. ¶¶ 22, 50) During the time period that directly correlates to this trading, every access to the Feng Interactive Brokers Account came from Chen, at the ING IP address. (Koster Decl. ¶ 52) On December 29, 2006, the first day of Genesis options trading in the Feng Interactive Brokers Account, multiple calls were exchanged between Chen's work line and Wang's work number at Morgan Stanley. (Koster Decl. ¶ 51)

On the morning of January 16, 2007, Genesis announced it had agreed to be acquired at a price of $63 per share. (Koster Decl. ¶ 38) The impact of the Genesis announcement on January 16, 2007 can be readily seen in the effect it had on the price of, and volume of trading in, Genesis common stock. (Koster Decl. ¶ 53) On January 12, 2007, the last trading day before the announcement, Genesis common stock closed at $52.85 per share, on volume of trading of

---

[2]    A call option contract gives the purchaser the right to purchase 100 shares of stock at the strike price of the option on or before the expiration date of the option. (Koster Decl. ¶ 43)

352,674 shares traded. (Koster Decl. ¶ 53) On January 16, 2007, the Genesis common stock closed at $61.26, on 3,592,250 shares traded. (Koster Decl. ¶ 55) Thus the stock price increased by 15% and the volume increased by 919%. (Koster Decl. ¶ 55)

All of the contracts in the Feng Interactive Brokers Account were sold immediately following the public announcement, on January 16 and 17, 2007, for a total of $620,280. (Koster Decl. ¶ 42) The approximate profit on these transactions totaled $572,575, for an approximate return on investment of 1,200%. (Koster Decl. ¶ 42)

The Genesis trading is unusual because all but 74 of the call options were purchased "out-of-the-money." (Koster Decl. ¶ 44) A transaction is called "out-of-the-money" because the strike price of the call option is higher than the trading price of the underlying security at the time the contract was purchased. (Koster Decl. ¶ 44) The option contract can only be exercised profitably when the trading price of the underlying security rises above the strike price of the call option. (Koster Decl. ¶ 44)

By way of example, the first purchase of options on Genesis stock made in the Feng Interactive Brokers Account was 30 call option contracts with a strike price of $55 per share and an expiration date of February 17, 2007. (Koster Decl. ¶ 45) This purchase, made on December 29, 2006, conveyed the right to purchase 3,000 shares of Genesis stock at $55 per share on or before February 17, 2007. (Koster Decl. ¶ 45) However, Genesis stock traded no higher than $48.23 per share on December 29, 2006, the day that the Feng Interactive Brokers Account bought the options. (Koster Decl. ¶ 46) Accordingly, if the stock price did not increase to $55 per share by February 17, 2007, the date of expiration, and the option was not sold prior to the expiration date, all of the money spent to purchase the option would be lost. (Koster Decl. ¶ 46)

In addition, options on Genesis stock trade relatively infrequently and the trades in the

Feng account represented a large portion of the total number of Genesis options contracts traded.

(Koster Decl. ¶ 48)  For example, the December 29, 2006 purchases represented 60% of all

trading in that options series.  (Koster Decl. ¶ 49)

On January 3, 4, 5 and 8, 2007, the Feng Interactive Brokers Account purchased a total of

356 call option contracts on Genesis stock with a strike price of $50 per share and an expiration

date of January 20, 2007, which represented 50% of all trading in that option series.  (Koster

Decl. ¶¶ 47, 49)  On January 3 and 9, 2007, the Feng Interactive Brokers Account purchased a

total of 110 call option contracts on Genesis stock with a strike price of $55 per share and an

expiration date of January 20, 2007, representing 27% of all trading in that options series.

(Koster Decl. ¶¶ 47, 49)  Finally, on January 4, 2007, a total of 74 call option contracts on

Genesis stock with a strike price of $45 per share and an expiration date of January 20, 2007

were purchased in the Feng Interactive Brokers Account, representing 89% of all trading in that

options series.  (Koster Decl. ¶¶ 47, 49)

Given Wang's access to material nonpublic information, the timing of the trading, the

unusual nature of the trading, the record of telephone calls between Wang and Chen, and the fact

that all of the trading was accomplished by Chen, in a secret account in his mother-in-law's

name that was not disclosed to his employer, the evidence is unmistakable that Wang and Chen

traded unlawfully.

b.    **Glenborough Realty Trust**

Wang also received notices by electronic mail related to Morgan Stanley's involvement

with the Glenborough deal.  (Koster Decl. ¶ 60)  On August 16, 2006, Wang received by

electronic mail GLLC minutes reflecting that the GLLC had approved a large loan to finance

11

"Project Gridiron," the project name for Glenborough, but that the approval of one more person was required and receipt of that approval was anticipated after the GLLC meeting.  (Koster Decl. ¶ 60)

These GLLC minutes describe "Gridiron" as a "publicly-traded office REIT" and state that the loan "will be secured by 65 properties comprising 6.5mm SF and primarily located in CBD and suburban markets of Washington, DC, California, New Jersey, Massachusetts, Florida, and Colorado."  (Koster Decl. ¶ 61)  The minutes further state that "[t]he total acquisition cost for Gridiron will be about $1,862mm based on a $27.00 share price, a 15.7% premium to the current stock price of $23.33."  (Koster Decl. ¶ 61)

Telephone records show several calls exchanged between Chen's office and Wang's work number at Morgan Stanley on August 16, 2006, suggesting that this information was shared.  (Koster Decl. ¶ 62)  The Feng Interactive Brokers account was accessed by Chen from ING multiple times on August 16, 2006, August 17, 2006, August 18, 2006, August 21, 2006, and August 22, 2006.  (Koster Decl. ¶ 63)  The same day that the Glenborough GLLC information was sent to Wang, August 16, 2006, and on August 18, 2006, the Feng Interactive Brokers Account purchased a total of 8,400 shares of Glenborough at an average price of $23.88 per share.  (Koster Decl. ¶ 56)

On August 21, 2006, before the opening of trading, Glenborough announced it had agreed to be acquired by Morgan Stanley Real Estate for $26 per share.  (Koster Decl. ¶ 57) Volume in the trading of Glenborough on August 18, 2006 was 257,600 shares traded, with a closing price of $24.03.  (Koster Decl. ¶ 58)  On the next trading day, which was August 21, 2006, trading volume was 1,777,800 shares traded, or an increase in volume of 590%.  (Koster Decl. ¶ 58)  The closing price on August 21, 2006 was $25.97, reflecting an 8% increase from

12

the prior close.  (Koster Decl. ¶ 58)  The next day on August 22, 2006, the Feng Interactive

Brokers Account sold all of its Glenborough stock for a profit of $17,283.  (Koster Decl. ¶ 59)

Thus, in connection with the Feng Interactive Brokers Account trading in Glenborough,

Wang received material nonpublic information; there is a record of telephone calls between

Wang and Chen; all of the trading was accomplished by Chen, in a secret account in his mother-

in-law's name; and the timing of the trading fits far too neatly, in relation to Wang's receipt of

information and the public announcement that sent the stock price up, for such trading to be

anything but fraudulent.

### c.     Town and Country Trust

On December 2, 2005, Wang received by electronic mail GLLC minutes reflecting that

the GLLC approved a large loan to finance "Project Magazine," the project name for Town and

Country, but that it required the approval of one additional individual, expected the following

week.  (Koster Decl. ¶ 66)  These GLLC minutes describe "Magazine" as a "publicly-traded

multifamily real estate investment trust," "self-administered and self-managed," and that "owns

and operates a portfolio of multifamily properties in the Mid-Atlantic and Southeast."  They

further state that "the loan will be securitized by first mortgage lien on 39 predominantly Class B

properties which include approximately 13,185 units."  (Koster Decl. ¶ 67)  Wang received

additional GLLC correspondence by electronic mail on December 7, 2005 reflecting that the

additional individual was expected to approve the loans on December 8, 2005.  (Koster Decl. ¶

68)

On December 8 and 14, 2005, the Feng Scottrade Account purchased a total of 3,000

shares of Town and Country.  (Koster Decl. ¶ 69)  Chen accessed the Feng Scottrade account

multiple times from the ING IP address during the period December 8, 2005 through February 9, 2006, the relevant period of the Town and Country trading. (Koster Decl. ¶ 79)

After the close of trading on December 19, 2005, Town and Country announced it had agreed to be acquired by Morgan Stanley Real Estate. (Koster Decl. ¶ 70) On December 19, 2005, Town and Country stock closed at $29.79, on volume of 46,500 shares traded; the next day, the first day of trading after the announcement, the stock closed at $33.75, on 1,895,700 shares traded. (Koster Decl. ¶ 71) As compared to December 19, 2005, trading at the close on December 20, 2005 reflected an increase in volume of 3,977% and an increase in the price per share of 13%. (Koster Decl. ¶ 71) On December 23, 2005, the Feng Scottrade Account sold the all 3,000 shares of Town and Country for a profit of $10,930. (Koster Decl. ¶ 72)

On January 23, 2006, Wang received by electronic mail GLLC minutes reflecting that "[a]nother suitor has offered a higher price per share" for Magazine and that now Morgan Stanley Real Estate was proposing to commit more money to the deal. (Koster Decl. ¶ 73) On January 27, 2006, the Feng Scottrade Account bought another 2,000 shares of Town and Country. (Koster Decl. ¶ 74)

On February 3, 2006, Wang received GLLC minutes by electronic mail reflecting that "GLLC approved increasing the loan amount based on a revised price of $40.00 per share." (Koster Decl. ¶ 75) During the period February 2 through 9, 2006, there were multiple public announcements that Morgan Stanley Real Estate was involved in a bidding war for Town and Country. (Koster Decl. ¶ 76)

Town and Country's stock price increased 19% between January 27 and February 9, 2006. (Koster Decl. ¶ 77) On February 9, 2006, the Feng Scottrade Account sold the 2,000 shares of Town and Country for a profit of $10,460. (Koster Decl. ¶ 78)

Plainly, the Town and Country trading follows the same unlawful pattern: Wang communicating material nonpublic information to Chen that she had a duty to keep confidential, then Chen trading on that information in the Feng Scottrade Account, and the use of this information by both, superbly timed to make the most profit for the Feng Account.

### 4. There is a Risk that Chen and Wang Will Leave the Country and Take the Proceeds of Their Fraud with Them.

There is a substantial risk that Chen and Wang will leave the country. Chen and Wang resigned from their positions at ING and Morgan Stanley when the firms asked them to answer questions about their trading. (Koster Decl. ¶¶ 5, 8) They recently listed their home in Queens for sale and appear to be unemployed. (Koster Decl. ¶ 9) As they are Chinese citizens and have family in China, there is a concern that they will return to China.

There is also a risk that Feng, Chen or Wang will transfer or dissipate the proceeds of the fraud from the Feng Interactive Brokers Account. Notwithstanding that Feng, Chen and Wang know of the Commission staff's interest in their trading, they have continued to trade in the Feng Interactive Brokers Account. As of April 30, 2007, there is $344,519.42 in cash and $507,118 in securities in the Feng Interactive Brokers Account. There are $1,807.98 in accruals and the total account balance is $853,455.40.[3] (Koster Decl. ¶ 84)

## IV.  LAW AND ARGUMENT

For the reasons set forth below, the relief sought by the Commission, including a temporary restraining order barring the Defendants from further violations of the federal

---

[3]    In addition, Chen has a brokerage account at Charles Schwab, which, as of May 8, 2007, had $257,134 in it. (Koster Decl. ¶ 85)

securities laws, as well as an asset freeze and other equitable relief, is necessary and appropriate

to protect investors and is in the public interest.

**A.    The Present Application Satisfies the Special Standard Applicable to Requests by the Commission for a Temporary Restraining Order and a Preliminary Injunction.**

Section 21(d) of the Exchange Act [15 U.S.C § 78u(d)] provides that:

> Whenever it shall appear to the Commission that any person is engaged, or is about to engage in acts or practices constituting a violation of any provision of this title, the rules or regulations thereunder, . . . it may in its discretion bring an action . . . to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond.[4]

By virtue of this statutory authority, the principles governing the issuance of an

injunction sought by the Commission are different than those governing a private party's request

for that relief.  Specifically, where Congress grants district courts jurisdiction to enjoin those

violating or about to violate federal statutes, "the standards of public interest, not the

requirements of private litigation, measure the propriety and need for injunctive relief." SEC v.

Unifund SAL, 910 F.2d 1028, 1035-36 (2d Cir. 1990), *quoting* The Hecht Company v. Bowles,

Price Administrator, 321 U.S. 321, 331 (1944).

Because the Commission is "not . . . an ordinary litigant, but . . . a statutory guardian

charged with safe-guarding the public interest in enforcing the securities laws," its burden to

secure temporary or preliminary relief is less than that of a private party.  SEC v. Management

Dynamics, Inc., 515 F.2d 801, 808-09 (2d Cir. 1975).  In particular, the Commission need not

show risk of irreparable injury or the unavailability of remedies at law.  *See* Unifund SAL, 910

F.2d at 1036, 1038, and the cases cited therein.  Rather, the Commission is entitled to entry of

---

[4]    Section 20(b) of the Securities Act of 1933 [15 U.S.C. § 77t(b)] and Section 209(d) of the Advisers Act 0f 1940 [15 U.S.C. § 80b-9(d)] similarly confer such authority to the Commission in connection with violations of those Acts.

temporary and preliminary injunctive relief against future securities law violations upon "a substantial showing of likelihood of success as to both a current violation and the risk of repetition." SEC v. Cavanagh, 155 F.3d 129, 132 (2d Cir. 1998), citing Unifund SAL, 910 F.2d at 1039-1040.

As set forth herein, the Commission has more than met its burden of making a "substantial showing" that it is likely to succeed in establishing each violation alleged against the Defendants in the Complaint and the risk of repetition of those violations. Accordingly, a temporary injunction against further violations by the Defendants is appropriate.

### 1.   The Commission is Substantially Likely to Succeed in Establishing That Defendants Have Violated the Antifraud Provisions of the Exchange Act.

The Commission has alleged in its Complaint violations of the antifraud provisions of the Exchange Act. There is a substantial likelihood that the Commission will succeed in establishing each of these violations.

Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit the employment of fraudulent devices in connection with the purchase or sale of a security. An individual violates these provisions when he trades, or tips others who trade, in a security: (i) on the basis of; (ii) material, nonpublic information; (iii) in breach of a fiduciary duty or other duty arising out of a relationship of trust and confidence; and (iv) has the requisite scienter. See Dirks v. SEC, 463 U.S. 646, 653-54 (1983); Chiarella v. United States, 445 U.S. 222, 227-35 (1980).

#### a.   Wang and Chen Traded on the Basis of Nonpublic Information Received from Wang.

An individual trades "on the basis of" material nonpublic information if the individual "was aware of the material nonpublic information when the person made the purchase or sale." 17 C.F.R. § 240.10b5-1. The Commission can prove an individual traded on the basis of

material nonpublic information through inferences from circumstantial evidence and not solely

based on direct evidence.  U.S. v. Larrabee, 240 F.3d 18, 21-22 (1st Cir. 2001); SEC v. Pardue,

2005 WL 736884, at *5 (E.D. Pa. Apr. 1, 2005); SEC v. Singer, 786 F.Supp. 1158, 1164

(S.D.N.Y. 1992).   Courts examine factors such as:  1) access to information; 2) relationship

between the tipper and tippee; 3) timing of contact between the tipper and tippee; 4) timing of

the trades; 5) pattern of the trades; and 6) attempts to conceal either the trades or the relationship

between the tipper and the tippee.  Larrabee, 240 F.3d at 21-22; Pardue, 2005 WL 736884, at *5

("Circumstantial evidence (such as contacts between the trader and persons with possession of

the material, non-public information, the suspicious timing of the trades, and the offering of

implausible reasons for the trades) may support an inference that insider trading has, in fact,

occurred."); Singer, 786 F.Supp. at 1164-65 ("[C]ircumstantial evidence such as suspicious

timing of trades, contacts between potential tippers and tippees, and incredible reasons for such

trades provide an adequate basis for inferring that tipping activity has occurred.").

The evidence strongly suggests that Chen and Wang traded in the securities of Genesis,

Glenborough and Town and Country (the "Acquirees") on the basis of material nonpublic

information obtained by Wang during her employment at Morgan Stanley.  Wang had access to

material nonpublic information regarding the Acquirees before it was publicly released.  As for

Town and Country and Glenborough, Wang received the GLLC minutes reflecting the financing

of these acquisitions.  As for Genesis, Wang had access to the folder on the shared network drive

that contained the documents showing the Principal Transaction Group's evaluation of Genesis

and had access to the Principal Transaction Group's employees who evaluated the Genesis

financing by virtue of her role supporting that Group.  In addition, the relationship between

Wang and Chen strongly suggests tipping.  Based on the trading in the account, it is a natural and

reasonable assumption that this material nonpublic information was conveyed from Wang to Chen, and the telephone records would seem to suggest as much.

Further, the timing and pattern of the trades indicate that they traded on the basis of the material nonpublic information to which Wang had access. The trading in the Acquirees occurred either on the same day or shortly after Wang received or acquired the information. The trading also followed the same pattern: the Feng accounts traded in securities of companies that were on the verge of announcing they would be acquired, and the Principal Transaction Group either was contacted for, or provided, financing for the acquisitions. Finally, Chen and Wang attempted to conceal their trading by using Wang's mother's account, by not disclosing to their employers their use of the Feng accounts, and by Chen's failure to clear the trading with his employer.

### b. The Information Was Material.

Information is material if a reasonable investor would consider it important in making an investment decision and if there is a substantial likelihood that its disclosure would have been viewed by the investor as having significantly altered the "total mix" of information available to the investor. *See* Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988). Information regarding a potential acquisition of a company can be material. *See* Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 185 (2d Cir. 2001) (finding that even information relating to a possible transaction that does not come to fruition may be material). Further, the market's reaction to the news is probative of materiality. *See* U.S. v. Mylett, 97 F.3d 663, 667 (2d Cir. 1996) (noting "sharp jump" in stock price when analyzing materiality).

The information Wang obtained regarding the financings of acquisitions of the Acquirees was material. Prior to the trading in the Feng accounts, there was no public information

regarding the pending acquisitions of the Acquirees.  Further, Wang knew that Morgan Stanley

Real Estate was planning to pay a 15.7% premium to the current stock price to purchase

Glenborough.  Accordingly, information regarding the acquisitions would have significantly

altered the "total mix" of information available to an investor.

The positive reaction of the market to the public announcements of the acquisitions also

supports the materiality of the information.  The stock prices of Town and Country,

Glenborough, and Genesis increased from the close of trading before the announcement to the

close after the announcement:  13%, 8%, and 15% respectively.  Further, the trading volume

from the close of trading before the announcement to the close after the announcement increased:

3,977%, 590%, and 919% respectively.

### c.  Wang and Chen Breached a Duty.

This matter involves liability under the misappropriation theory.[5]  Under this theory, a

person who is not an insider of the issuer of the securities violates the antifraud provisions by

knowingly or recklessly using material, nonpublic information in connection with a securities

transaction in breach of a duty owed to the source of the information.  United States v. O'Hagan,

521 U.S. 642, 651-652 (1997).  Under Rule 10b5-2, "a duty of trust or confidence for purposes

of the 'misappropriation' theory of insider trading exists . . . [w]henever a person agrees to

maintain information in confidence . . . ."  17 C.F.R. § 240.10b5-2(b)(1).

A tippee violates the antifraud provisions by trading while in possession of material,

nonpublic information, or disclosing such information to others, if the tippee knew or should

---

5    Although the evidence currently supports the misappropriation theory, Wang and Chen
may also be liable as "temporary insiders" under the classical theory of insider trading.  See SEC
v. Downe, 92 Civ. 4092 (PKL), 1993 WL 22126, at *6-7 (S.D.N.Y. Jan. 26, 1993); U.S. v.
Victor Teicher & Co., 785 F. Supp. 1137, 1148 (S.D.N.Y. 1992); SEC v. Gaspar, 83 Civ. 3037
(CBM), 1985 WL 521, at *16-17 (S.D.N.Y. Apr. 16, 1985).

have known that the information was disclosed in breach of a fiduciary duty. Dirks, 463 U.S. at

659-64. As the Supreme Court explained in Dirks:

> A tippee assumes a fiduciary duty to the shareholders of a corporation not to trade on the material nonpublic information only when the insider has breached his fiduciary duty to the shareholders by disclosing information to the tippee and the tippee knows or should know that there has been a breach.

Dirks, 463 U.S. at 660. Put simply, a tippee has a derivative duty not to trade on material

nonpublic information when the disclosure of the tipper is improper and the tippee knows or

should know that this is the case. See id. at 659-60. Whether an insider's disclosure breaches his

fiduciary duty to his corporation, and is therefore, improper, depends largely upon the purpose

for the disclosure. See id. at 662. Specifically, an insider's disclosure is improper when

corporate information, intended to be available for only corporate purposes, is used for personal

benefit. Id. at 654. The Commission need not prove that the insider anticipated or received a

specific, tangible benefit in exchange for the tip. See SEC v. Warde, 151 F.3d 42, 48 (2nd Cir.

1998). For example, a tipper can derive a benefit by using the information to obtain a pecuniary

gain, a reputational benefit that will translate into future earnings, or simply to confer a gift of

confidential information to a friend or relative who trades on the information or who tips others

who trade. See Dirks, 463 U.S. at 663-64.

Wang had a duty to maintain information about Principal Transactions Group's

evaluation of financing for acquisitions of the Acquirees in confidence. Pursuant to her

certification that she would abide by Morgan Stanley's policies and procedures, Wang owed a

duty to maintain the information obtained when Morgan Stanley was retained or contacted to

provide services on a confidential basis in connection with the potential acquisitions. Further,

Wang was prohibited by Morgan Stanley's policies from using confidential information obtained

during the course of her employment when trading in her account or someone else's account.

Further, Chen, as a tippee, had a duty to maintain information about the acquisitions of the Acquirees in confidence. As a securities professional himself, Chen understood that Wang owed a duty to maintain information obtained in her employ at Morgan Stanley in confidence. Wang benefited by passing this information to Chen because the proceeds from the trading entered an account they controlled and she likely would share in the proceeds therefrom.

### d. Wang and Chen Acted with Scienter.

Scienter includes conduct evidencing an intent to deceive, manipulate or defraud as well as conduct evidencing a reckless disregard for misleading statements. Aaron v. SEC, 446 U.S. 680, 686 (1980); SEC v. Kenton Capital, Ltd., 69 F. Supp.2d 1, 10 (D.D.C. 1998). Recklessness is conduct which is "highly unreasonable" and which represents "an extreme departure from the standards of ordinary care." Rolf v. Blyth Eastman Dillon & Co., 570 F.2d 38, 46 (2d Cir.), cert. denied, 439 U.S. 1039 (1978). Scienter may be inferred from circumstantial evidence. Pardue, 2005 WL 736884, at *6. An individual who trades while in possession of information, which he knows, or has reason to know, is confidential and improperly obtained, or who trades in reckless disregard of this fact, has acted with scienter. See Dirks, 463 U.S. at 660-61.

Wang and Chen acted with scienter. The timing of the trading in the Feng accounts, the increasing amounts of the trades, the use of options trading in Genesis shows that the Defendants knew Wang had information they could take advantage of to their benefit and became more aggressive about using this information to their personal benefit as time passed and their trading went undiscovered. U.S. v. Ginsburg, 99-8694C-IV, 2000 WL 1299020, at *6 (S.D. Fl. Jan. 10, 2000) ("evidence of suspicious timing of communications and trading may support an inference of bad faith and scienter"). Further, the fact that Chen and Wang opened accounts in Feng's name expressly for the purpose of making these trades and did not disclose the existence of these

accounts to either of their employers shows scienter. U.S. v. Fox, 855 F.2d 247, 253 (5th Cir.

1988) (finding evidence of "opening accounts expressly for making the[] trades" indicative of

scienter).

**2.    There is a Substantial Likelihood that Defendants' Wrongdoing Will be Repeated.**

The second prong of the test for issuing a temporary restraining order -- that a substantial

likelihood exists that the wrong will be repeated unless enjoined -- is clearly satisfied here.  In

the present case, there is a high probability that Defendants will continue to violate the federal

securities laws unless restrained and enjoined.  As the Second Circuit instructed in Management

Dynamics, Inc.:

> Certainly, the commission of past illegal conduct is highly suggestive of the likelihood of future violations . . . [F]actors suggesting that the infraction might not have been an isolated occurrence are always relevant . . . Moreover, the appellate courts have repeatedly cautioned that cessation of illegal activity does not *ipso facto* justify the denial of an injunction.

515 F.2d at 807 (internal citations omitted).  In assessing the likelihood of repetition, courts also

look to such factors as the character of the violation and the degree of scienter involved.  *See,*

*e.g.*, Cavanagh, 155 F.3d at 135;  SEC v. Commonwealth Chemical Securities, Inc., 574 F.2d 90,

100-01 (2d Cir. 1978); SEC v. Musella, 578 F. Supp. 425, 444 (S.D.N.Y. 1984).

As discussed above, Defendants' violations of the federal securities laws are egregious,

deliberate and highly deceptive.  Given the highly profitable nature of the pattern of their trading

and its apparent sophistication, there is every reason to believe that Wang and Chen will continue

their violations unless enjoined.  Further, they continue to trade in the Feng account

notwithstanding knowledge of the staff's investigation.  Therefore, a temporary restraining order

is warranted to preserve the *status quo* pending a preliminary injunction hearing.

**B.**    **The Court Should Issue an Order Freezing the Assets of Defendants and Relief Defendant.**

In this case, a freeze of the Defendants' assets is necessary to preserve funds and other property that later may be necessary to satisfy any order of disgorgement, civil penalty, or other relief that may ultimately be imposed by the Court.[6]  Indeed, as the courts of the Second Circuit have recognized, an order for disgorgement or other final monetary relief will often be rendered meaningless without an asset freeze during the pendency of the action.  *See, e.g.*, SEC v. Unifund SAL, 910 F.2d at 1028; SEC v. Vaskevitch, 657 F. Supp. 312, 315 (S.D.N.Y. 1987).  Moreover, to obtain an asset freeze the Commission need only show that it is likely to succeed on the merits of the case.  Cavanagh, 155 F.3d at 132.

Courts in this District have frequently granted the Commission orders freezing assets in similar cases where, as here, there was a concern that the defendant might dissipate assets or transfer assets beyond the jurisdiction of the United States.[7]  *See, e.g.*, SEC v. Grand Logistic, 06 Civ. 15274 (DAB) (S.D.N.Y. 2006) (asset freeze order entered by Judge Rakoff); SEC v. Lohmus Haavel & Viisemann, 05 Civ. 9259 (RWS) (S.D.N.Y. 2005) (asset freeze order entered by Judge Sweet); SEC v. Anticevic, 05 Civ. 6991 (KMW) (S.D.N.Y. 2005) (asset freeze order entered by Judge Wood); SEC v. Certain Unknown Purchasers of the Call Options of Duracell

---

[6]    It is clear that the Commission may seek, and this Court in the exercise of its broad equitable powers may order, disgorgement and restitution of ill-gotten gains.  SEC v. Blatt, 583 F.2d 1325, 1335 (5th Cir. 1978); SEC v. Shapiro, 494 F.2d 1301, 1309 (2d Cir. 1974); SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1105-1106 (2d Cir. 1972).  Pursuant to Section Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], the Commission also may seek, and the Court may order, the payment by the Defendants of civil money penalties for the violations described above.

[7]    An order freezing assets may also properly be directed to other persons or entities who allegedly hold the funds on behalf of the defendant.  United States v. First Nat'l City Bank, 379 U.S. 378 (1965).  Moreover, once personal jurisdiction over a party is obtained, it is appropriate to enter a freeze order against that party to prevent the transfer of assets under its control, within or outside the United States.  Id. at 384.

Int'l, Inc., 96 Civ. 7917 (SAS) (S.D.N.Y. 1996) (asset freeze order entered by Judge Scheindlin);

SEC v. Morris, 94 Civ. 8518 (CBM) (S.D.N.Y. 1994) (asset freeze order entered by Judge

Patterson); SEC v. Roman, 94 Civ. 3621 (SAS) (S.D.N.Y. 1994) (asset freeze order entered by

Judge Griesa); SEC v. Tinajero, 91 Civ. 2708 (JFK) (S.D.N.Y. 1991) (asset freeze order entered

by Judge Owen); SEC v. Heider, 90 Civ. 4636 (CSH) (S.D.N.Y. 1990); SEC v. Fondation Hai,

90 Civ. 0277 (SWK) (S.D.N.Y. 1990); SEC v. Finacor, 89 Civ. 7667 (JMC) (S.D.N.Y. 1989);

SEC v. Wang and Lee, 88 Civ. 4461 (RO) (S.D.N.Y. 1988); SEC v. Banca Della Svizzera

Italiana, 81 Civ. 1836 (MP) (S.D.N.Y. 1981).

Where there are concerns that the defendant might dissipate assets, or transfer or secrete

assets beyond the jurisdiction of the United States, this Court need only find some basis for

inferring a violation of the federal securities laws in order to impose a freeze order.  Where

"[t]here is a basis to infer that the . . . [defendants] traded on inside information, and while the

Commission is endeavoring to prove at trial the requisite element of trading in breach of a

fiduciary duty of which the defendants were or should have been aware, the Commission should

be able to preserve its opportunity to collect funds that may yet be ordered disgorged." SEC v.

Unifund SAL, 910 F.2d 1028, 1041 (2d Cir. 1990).  Indeed, in Unifund the court upheld an asset

freeze order even though it found that the evidence was insufficient to uphold the entry of a

preliminary injunction.

In this case, there is a substantial danger the Defendants may remove assets beyond the

jurisdiction of the Court.  Both Defendants are citizens of China, with relatives domiciled outside

the United States.  Relief defendant Feng is a Chinese national residing in Beijing.  The

Defendants and relief defendant Feng have full access to the assets held in their trading accounts

in the United States.  Those assets currently total more than $800,000, all or some of which may,

at any time, be transferred overseas beyond the reach of the Commission to obtain any illegal proceeds. Further, Defendants Chen and Wang have resigned from their positions at ING and Morgan Stanley, and have listed one home for sale.

Under the circumstances, a freeze of Defendants' assets is warranted and should be ordered by the Court. Moreover, a freeze will merely preserve the *status quo*, and will not cause the Defendants or relief defendant Feng any substantial harm, pending the Court's determination of the Commission's request for injunctive relief.

## C.    The Court Should Order Defendants and Relief Defendant to Repatriate Funds.

The Commission also asks the Court to issue an Order requiring Defendants and relief defendant Feng to repatriate proceeds of the fraud transferred from their trading accounts in the United States to foreign jurisdictions. Such relief will further protect the funds from dissipation, and is appropriate when, as here, Defendants are citizens, with relatives domiciled outside the United States, and relief defendant Feng is a Chinese national residing in Beijing. *See* SEC v. Bankers Alliance Corp., 1995 WL 590665 (D.D.C 1995) (Commission sought enforcement of court order granting broad injunctive relief, including order to repatriate funds); *see also* SEC v. Lohmus Haavel & Viisemann, 05 Civ. 9259 (RWS) (S.D.N.Y. 2005).

## C.    The Court Should Order the Preservation of Documents.

The Commission also seeks an order preventing alteration or destruction of documents in order to protect the documents necessary to establish a complete record in this matter. Good faith preservation of documents cannot be assumed in the context of a fraudulent scheme.

## E.    The Court Should Order Alternative Service of Process.

The Commission asks this Court to authorize service upon Defendants or their attorneys by telefax, and/or overnight courier service, and/or by electronic mail; and upon relief defendant

Feng by serving Interactive Brokers, LLC, the broker with whom Feng currently maintains an active trading account in the United States, or any of its affiliates, successors in interest and assigns, by telefax, and/or overnight courier service, and/or by electronic mail.  Although the Commission will, if necessary, attempt to effect service by other means permitted under Fed. R. Civ. P. 4, service by electronic mail and/or express courier will maximize the possibility that the Defendants and relief defendant Feng will receive prompt actual notice of the Complaint, all orders of this Court, and the other papers filed in this action.  In addition, the Commission anticipates that serving relief defendant Feng through Interactive Brokers, LLC will avoid any unnecessary delay that may result from the bureaucratic and legal complications often associated with service of judicial documents to individuals residing in China.  Service upon a foreign defendant's United States broker has been permitted in this district.  *See* SEC v. Blue Bottle Limited, 07 Civ. 1380 (CSH) (S.D.N.Y. 2007) (Order permitting service on foreign defendant's United States broker entered by Judge Haight).

V.    **CONCLUSION**

For the reasons set forth above, the Commission requests the Court issue the Order to

Show Cause, Temporary Restraining Order, and Order Freezing Assets and Granting Other

Relief in the form of that submitted with the instant Application.

Respectfully submitted,

Amy J. Greer
Kingdon Kase
Tami S. Stark
Colleen K. Lynch

Attorneys for Plaintiff:

SECURITIES AND EXCHANGE COMMISSION
Mellon Independence Center
701 Market Street, Suite 2000
Philadelphia, PA  19106
(215) 597-3100


DATED:       May 10, 2007