# Exhibit 1

**Christopher Dysard**

| | |
|---|---|
| **From:** | Brodsky, Reed (USANYS) [Reed.Brodsky@usdoj.gov] |
| **Sent:** | Monday, May 14, 2007 4:18 PM |
| **To:** | David Spears; Christopher Dysard |
| **Cc:** | Brodsky, Reed (USANYS) |
| **Subject:** | 5-14-07 Chen and Wang U.S. Passports |

David/Chris:  I received the U.S. Passports of Ruopian Chen and Xujia Wang from Chris.  I provided them to the Criminal Clerk's Office at the US Attorney's Office where they will remain filed until otherwise ordered or directed by the court.  Regards, -Reed

# Exhibit 2



中华人民共和国驻纽约总领事馆
Consulate-General of the People's Republic of China in New York

News    Foreign Ministry    Consulate    Passport &    Press    Culture    Education    Commerce    Sci &    Overseas    Topics    Links    Notice
        Spokesperson's    Information    Visa    Office                                              Tech    Chinese
        Remarks

Home > Passport & Visa > Laws and Regulations

# Nationality Law of the People's Republic of China

Adopted at the Third Session of the Fifth National People's Congress, promulgated by Order No. 8 of the Chairman of the Standing Committee of the National People's Congress on and effective as of September 10,1980.

Article 1

This Law is applicable to the acquisition, loss and restoration of nationality of the People's Republic of China.

Article 2

The People's Republic of China is a unitary multinational state; persons belonging to any of the nationalities in China shall have Chinese nationality.

Article 3

The People's Republic of China does not recognize dual nationality for any Chinese national.

Article 4

Any person born in China whose parents are both Chinese nationals or one of whose parents is a Chinese national shall have Chinese nationality.

Article 5

Any person born abroad whose parents are both Chinese nationals or one of whose parents is a Chinese national shall have Chinese nationality. But a person whose parents are both Chinese nationals and have both settled abroad, or one of whose parents is a Chinese national and has settled abroad, and who has acquired foreign nationality at birth shall not have Chinese nationality.

Article 6

Any person born in China whose parents are stateless or of uncertain nationality and have settled in China shall have Chinese nationality.

Article 7

Foreign nationals or stateless persons who are willing to abide by China's Constitution and laws and who meet one of the following conditions may be naturalized upon approval of their applications:

(1)they are near relatives of Chinese nationals?

(2)they have settled in China; or

(3)they have other legitimate reasons.

Article 8

Any person who applies for naturalization as a Chinese national shall acquire Chinese nationality upon approval of his application; a person whose application for naturalization as a Chinese national has been approved shall not retain foreign nationality.

Article 9

Any Chinese national who has settled abroad and who has been naturalized as a foreign national or has acquired foreign nationality of his own free will shall automatically lose Chinese nationality.

Article 10

Chinese nationals who meet one of the following conditions may renounce

Chinese nationality upon approval of their applications:

(1)they are near relatives of foreign nationals?

(2)they have settled abroad; or

(3)they have other legitimate reasons.

Article 11

Any person who applies for renunciation of Chinese nationality shall lose Chinese nationality upon approval of his application.

Article 12

State functionaries and military personnel on active service shall not renounce Chinese nationality.

Article 13

Foreign nationals who once held Chinese nationality may apply for restoration of Chinese nationality if they have legitimate reasons; those whose applications for restoration of Chinese nationality have been approved shall not retain foreign nationality.

Article 14

Persons who wish to acquire, renounce or restore Chinese nationality, with the exception of the cases provided for in Article 9,shall go through the formalities of application. Applications of persons under the age of 18 may be filed on their behalf by their parents or other legal representatives.

Article 15

Nationality applications at home shall be handled by the public security bureaus of the municipalities or counties where the applicants reside; nationality applications abroad shall be handled by China's diplomatic representative agencies and consular offices.

Article 16

Applications for naturalization as Chinese nationals and for renunciation or restoration of Chinese nationality are subject to examination and approval by the Ministry of Public Security of the People's Republic of China. The Ministry of Public Security shall issue a certificate to any person whose application has been approved.

Article 17

The nationality status of persons who have acquired or lost Chinese nationality before the promulgation of this Law shall remain valid.

Article 18

This Law shall come into force on the day of its promulgation.

Note:

The English translation has not been examined and approved by the legislative body and can not be used as basis for law enforcement

Case 1:07-cv-03715-AKH    Document 18-2    Filed 05/15/2007    Page 6 of 25

and public prosecution. Therefore it is for your reference only.

[Suggest to a Friend]    _____    Submit    [Print]

All Rights Reserved 520 12TH AVENUE,NEWYORK NY 10036,USA

# Exhibit 3

$2,000,000 PRB; 2 FRP BY 5/15 SECURED BY $150,000 CASH/PROPERTY; DEFT'S NJ HOME (BY 5/17) TRAVEL
RESTRICTED TO SDNY/EDNY/NJ; SURRENDER TRAVEL DOCUMENTS (& NO NEW APPLICATIONS) DONE; STRICT
PRETRIAL SUPERVISION; DEF'T TO BE RELEASED UPON FOLLOWING CONDITIONS: SIGNING OF THE BOND;
REMAINING CONDITIONS TO BE MET BY: CO-SIGNER BY 5/15, POSTING PROPERTY AND CASH BY 5/17.

AO 98 (Rev. 8/85)

# United States District Court

DOC # 6

## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

XUJIA WANG
Defendant

**APPEARANCE BOND**
CASE NUMBER

07 MAG 743

U.S. DISTRICT COURT
FILED
MAY 10 2007
S.D. OF N.Y.

Non-surety:   I, the undersigned defendant acknowledge that I and my...

Surety:   We, the undersigned, jointly and severally acknowledge that we and our...

personal representatives, jointly and severally, are bound to pay to the United States of America the sum of

$  2,000,000                              , and there has been deposited in the Registry of the Court the sum of

$  150,000              in cash or  PROPERTY: DEFT'S NJ HOME

Describe other security

The conditions of this bond are that the defendant          XUJIA WANG

Name

is to appear before this court and at such other places as the defendant may be required to appear, in accordance with any and all orders and directions relating to the defendant's appearance in this case, including appearance for violation of a condition of defendant's release as may be ordered or notified by this court or any other United States district court to which the defendant may be held to answer or the cause transferred. The defendant is to abide by any judgment entered in such a manner by surrendering to serve any sentence imposed and obeying any order or direction in connection with such judgement.

It is agreed and understood that this is a continuing bond (including any proceeding on appeal or review) which shall continue until such time as the undersigned are exonerated.

If the defendant appears as ordered or notified and otherwise obeys and performs the foregoing conditions of this bond, then this bond is to be void, but if the defendant fails to obey or perform any of these conditions, payment of the amount of this bond shall be due forthwith. Forfeiture of this bond for any breach of its conditions may be declared by any United States district court having cognizance of the above entitled matter at the time of such breach and if the bond if forfeited and if the forfeiture is not set aside or remitted, judgment may be entered upon motion in such United States district court against each debtor jointly and severally for the amount above stated, together with interest and costs, and execution may be issued and payment secured as provided by the Federal Rules of Criminal Procedure and any other laws of the United States.

This bond is signed on    May 10, 2007    at U.S. Courthouse, 500 Pearl Street, New York, N.Y. 10007
Date

Defendant _____    Address  Millstone Twp, NJ 07726
XUJIA WANG

Surety _____    Address  NY, NY 10280
XINYU LIU

Surety _____    Address  21 Inverness Lane
Yuming Ren                                    East Windsor, NJ 08520

Signed and acknowledged before me on          May 10, 2007
Date

Chisun Chen as to D.
Chisun Chen as to X.L.
Robert Inn As to cosigner
Yuming Ren on 5/14/07

Approved: _____
Judicial Officer
AUSA REED MICHAEL BRODSKY

Judicial Officer/Clerk

# Exhibit 4

2 MILLION PRB TO BE CO-SIGNED BY 2 FINANCIALLY RESPONSIBLE PERSON'S BY 5/15/07; SECURED BY $150,000 CASH/PROPERTY; DEFT'S NJ HOME (BY 5/17/07); TRAVEL LIMITED TO SDNY/EDNY; AND DISTRICT OF NEW JERSEY; SURRENDER TRAVEL DOCUMENTS (& NO NEW APPLICATIONS) DONE; STRICT PRETRIAL SUPERVISION; HOME DETENTION WITH ELECTRONIC MONITORING; DEFT TO BE RELEASED UPON SIGNING BOND; EXECUTING CONSENT TO FREEZE DEFT'S CHARLES SCHWDS SECURITIES ACCOUNT; REMAINING CONDITIONS TO BE MET BY CO-SIGNER BY 5/15/07; POSTING PROPERTY AND CASH BY 5/17/07

AO 98 (Rev. 8/85)

# United States District Court
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

RUOPIAN CHEN
_Defendant_

**APPEARANCE BOND**
CASE NUMBER

07 MAG 743

U.S. DISTRICT COURT FILED MAY 10 2007 S.D. OF N.Y.

DOC # 8

Non-surety:     I, the undersigned defendant acknowledge that I and my...

Surety:   We, the undersigned, jointly and severally acknowledge that we and our...

personal representatives, jointly and severally, are bound to pay to the United States of America the sum of

$ 2 MILLION                          , and there has been deposited in the Registry of the Court the sum of

$ 150,000                  in cash or   PROPERTY: DEFT'S NEW JERSEY HOME
_____
                                        Describe other security

The conditions of this bond are that the defendant        RUOPIAN CHEN
                                                          _Name_

is to appear before this court and at such other places as the defendant may be required to appear, in accordance with any and all orders and directions relating to the defendant's appearance in this case, including appearance for violation of a condition of defendant's release as may be ordered or notified by this court or any other United States district court in which the defendant may be held to answer or the cause transferred. The defendant is to abide by any judgment entered in such a manner by surrendering to serve any sentence imposed and obeying any order or direction in connection with such judgement.

It is agreed and understood that this is a continuing bond (including any proceeding on appeal or review) which shall continue until such time as the undersigned are exonerated.

If the defendant appears as ordered or notified and otherwise obeys and performs the foregoing conditions of this bond, then this bond is to be void, but if the defendant fails to obey or perform any of these conditions, payment of the amount of this bond shall be due forthwith. Forfeiture of this bond for any breach of its conditions may be declared by any United States district court having cognizance of the above entitled matter at the time of such breach and if the bond if forfeited and if the forfeiture is not set aside or remitted, judgment may be entered upon motion in such United States district court against each debtor jointly and severally for the amount above stated, together with interest and costs, and execution may be issued and payment secured as provided by the Federal Rules of Criminal Procedure and any other laws of the United States.

This bond is signed on        May 10, 2007        at U.S. Courthouse, 500 Pearl Street, New York, N.Y. 10007
                              _Date_

Defendant _[signature]_          Address   Millstone Twp. NJ 07726
          RUOPIAN CHEN

Surety _[signature]_             Address   NY, NY 10280
       XIAYU LIU

Surety _[signature]_             Address   21 Inverness Lane, East Windsor
       Yuning Ren                          NJ 0812

Signed and acknowledged before me on        May 10, 2007
                                            _Date_

                                            _[signature]_
                                            _Judicial Officer/Clerk_

Approved: _[signature]_                     Chiau Cheng as to X.L.
                                            Yuht Ren as to Yuning Ren
          _Judicial Officer_                Yuning Ren on 5/14/07

AUSA REED BRODSKY

# Exhibit 5

PART I

## CONDO-COOP-HOA PROPERTY DATA SECTION (PDS)

**★ Means Required Information**    *Broker Load (Y or N) [ ]    *ML# [ ][ ][ ][ ][ ][ ][ ]

**LOCATION**

Street #: 77-34    Street Dir: [ ]    *Street Name: 113 TH STREET    St Suffix: [ ]

Unit #: 3G    *Town: FOREST HILLS    *Zone: 10    *Zip: 11375    Zip + 4: [ ]

Cross St: 113 TH STREET / 78 AVE    Development: F.H. SOUTH

School District Name: [ ]    School District #: 196    District: 28

Section: [ ]    Block: [ ]    Lot: [ ]    Building: [ ]

Tax Unit #: [ ]    *Waterfront (Y or N): N    Waterfront Desc.: [ ]    *Waterview (Y or N): [ ]

**PRICE & DATES**

*Listing Price: 438,888    *Taxes: [ ]    Additional Village Taxes: [ ]

Total Value: [ ]    Common Charges: [ ]    Maintenance: [ ]

Deductible %: 50    Heating: INC    Management: CHARTIA

Insurance: [ ]    Sewer: PUBLIC    Electric: [ ]

Reserve: HEALTHY    Fees: [ ]    Other Fees: [ ]

*Listing Date: 4/12/2006    *Exp Date: 4/12/2007

**FINANCE**

*Mortgage Balance: [ ]    Interest Rate%: [ ]    Years To Go: [ ]

Principal Interest & Taxes: [ ]    Owner Financing (Y or N): [ ]    Assumable (Y or N): [ ]    Fixed Rate (Y or N): [ ]

Finance Restrictions: [ ]

**TERISTICS**

*Type Ownership (Condo, Co-op, Homeowner's Assoc): CO-OP

*Model Name: 28G/28TH    Detached/Att (Det-Att-Sd): DET    # Floors in Building: 06

Unit on Floor #: 03    # Floors in Unit: 0    *Rooms: 5.5    *Bedrooms: 02    *Baths-Full: 02    *Baths-Half: [ ]

*Kitchen Type (None, Combo, Eik, Eff): EIK    *Dining Room: Y    *Basement (Crawl-Full-Part-None-Opt): [ ]

**APPLIANCES**

*Stove: [1]  *Refrigerator: [2]  *Washer: [3]  *Dryer: [4]  *Dishwasher: [ ]

**UTILITIES**

*Fuel: OIL  *Heat: STEAM  *A/C (# or CAC): # 3

**OWNER/BROKER**

*Owner: NONG / CHEN  *Phone #: 7 1 8 5 4 4 4 0 0 0

*Selling Broker Commission: 15  *Buyer Broker Commission: 15

Agency (Enter A If Agency): [ ]  *Exclusions (Y or N): [ ]  *Negotiate Direct (Y or N): N  Occupancy: [ ]

Show Instructions: CALL OFFICE FOR APPOINTMENT  Lockbox (Y or N): [ ]

**REMARKS**

Remarks: FABULOUS 2 BR / 2 BTH SUNNY RENOVATED EIK
& 2 BATH, DW SUNKEN LIVING ROOM, HARDWOOD
FLOORS, ENGLISH PRIVATE GARDEN, ½ BLOCK TO E & F
TRAINS

*Directions: MAPQUEST.COM

Ad Text: SUNNY 2 BR / 2 BTH SUNNY RENOVATED EIK & 2
(Enter public remarks or advertising text here) CUSTOM BATHS SUNKEN LIVING ROOM HARDWOOD
FLOORS DOORMAN ENGLISH PRIVATE GARDEN ½ BL
TO QUEENS BLVD # E & F TRAINS MUST SEE.

**OPEN HOUSE**

Open House Date: N/A  Open House Time: [ ]

Open House Note: [ ]

**MISCELLANEOUS**

*Also For Rent (Y or N): [ ]  Rental Price: [ ]  Renting Broker Commission: [ ]

Items Excluded In Sale: [ ]

*Supersedes (Y or N): [ ]  Supersedes ML #: [ ]  Foreclosure (Y or N): N

President Board/Managing Agent: [ ]

Managing Agent Phone #: 7 1 8 5 4 4 4 0 0 0  Bylaws Attached (Y or N): [ ]

**SIGNATURES**

OWNER SIGNATURE _____  OWNER SIGNATURE _____

ADDRESS 77-34 113TH STREET #3C FOREST HILLS, N.Y. 11370

RESIDENTIAL PHONE (718) 544-4000  OFFICE PHONE 718 / 544-4000

LISTING AGENT Peter ANGELA  LIBOR MEM. # 57047  PH.# 718 / 544-4000

CO. AGENT _____  LIBOR MEM. # _____  PH.# _____

DATE 1/12/2006  REALTOR Weichert REALTOR F.11

CONDO-COOP-HOA PROPERTY - LI-IO REV. 10/2002

**OWNER'S COPY**

Subsidiary of Long Island Board of Realtors, Inc

M.L.S.
List Price $ ___438,588___

N.Y. 11375

## LISTING AGREEMENT FOR REAL PROPERTY
### EXCLUSIVE RIGHT TO SELL
*Commission Rates for the Sale, Lease or Management of Property Shall be Negotiated between the BROKER[1] and the Owner.*

**EMPLOYMENT**

1. The BROKER agrees to act as a special limited agent for the Owner(s) for the sole purpose of finding a Purchaser and/or Tenant to buy and/or rent the property described in the PROPERTY DATA SECTION hereinafter called PDS at the price and conditions set in the PDS. The PDS is incorporated herein by reference.

2. The parties agree that the BROKER shall cooperate with Participants in the Multiple Listing Service of Long Island, Inc. (MLSLI). The rate of compensation set forth in Paragraph 7 of this agreement along side the designation "SBC" will be the compensation paid by the BROKER to a subagent for the subagent's assistance to the BROKER in the performance of the BROKER'S obligations under this Agreement. Offering SBC compensation authorizes the BROKER to appoint subagents.

3. The Owner(s) acknowledges that the BROKER shall cooperate with agents who represent buyers with the understanding that such buyer's agents will be representing only the interest of the prospective purchaser. The rate of compensation to be paid by the BROKER to a participant representing the buyer is set forth in Paragraph 7 of this agreement along side the designation "BBC".

4. The Owner(s) authorizes the BROKER to enter the information set forth in the PDS, and any photographs of the Owner's property whether taken by BROKER'S agent, supplied by Owner or otherwise (listing content), into a listing content compilation owned by MLSLI. The Owner understands and agrees that said compilation is exclusively owned by MLSLI who alone possesses the right to publish said compilation in any media form it deems appropriate including, the World Wide Web. MLSLI may license, sell, lease and commercially utilize its compilation. Among other uses MLSLI may license or sell the listing content to aggregators who will aggregate the listing content and resell the same. Such aggregated content shall not contain any personal information about the Owner other than the Owner's name.

5. BROKER agrees to use its experience and knowledge to determine the appropriate marketing plan for the property. The Owner(s) grants to the BROKER full discretion to determine an appropriate marketing plan for the property.

6. The Owner shall not offer nor show their property for sale to any perspective buyers but shall refer all such perspective buyers to the BROKER, nor shall the Owner negotiate the sale of the property with a buyer unless the BROKER participates in such negotiations.

**COMPENSATION**

7. The Owner(s) hereby agrees to pay the BROKER a total commission in the amount of ___4.5__% of the selling price or $_____. Said commission shall be shared in the event that a subagent or buyer's broker procures a purchaser as follows:
   If the participant is a subagent; SBC ____5____% of the selling price or $_____.
   If the participant is a buyer's broker; BBC ____5____% of the selling price or $_____.
   Said total commission shall be earned and payable under the following conditions:
   (a) If the BROKER produces a buyer ready, willing and able to purchase the property on the terms and conditions set forth in the PDS;
   (b) If the BROKER produces a buyer ready, willing and able to purchase the property on any other terms and conditions agreeable to the Owner;
   (c) If the property is sold during the term of this Agreement whether or not the sale is a result of the BROKER'S efforts and even if the property is sold as a result of the efforts of the Owner(s) or any other broker or agent not acting under this agreement.

8. The above compensation shall be paid to the BROKER in the event that the Owner enters into a contract of sale to sell the property or actually sells the property within a period of _____ ( ) days after the termination of the agreement to any person (buyer) who has been shown the property during the term of this agreement. This paragraph shall not apply if the Owner(s) has relisted the property with another broker after the expiration of this Agreement and prior to the commencement of negotiations with such buyer.

**GOOD FAITH**

9. In the event the Owner(s) signs a binder/contract of sale during the term of this employment agreement, the parties agree that the expiration date set forth below shall be extended until the time that said contract of sale is fully performed or until such time as said contract fails to be performed either by its terms or because of the default of one of the parties. Nothing herein contained is intended to reduce the term of this Agreement.

10. The Owner(s) agrees at all times to act in good faith to assist the BROKER in the performance of the BROKER'S obligations and to fully cooperate with the BROKER in the BROKER'S efforts to find a buyer for the property.

**RENTAL OF THE PROPERTY**

11. Should the Owner(s) desire to rent the property or any portion thereof during the period of this agreement, the Owner(s) shall employ the BROKER as the sole and exclusive BROKER for such purpose and shall enter into an agreement the same as this agreement with respect to such employment except said agreement shall specify the amount of the rent desired by the Owner(s) and the terms of the rental including the amount of commission to be paid to the BROKER and whether said commission is to be paid by the Owner(s) or the Tenant. Said employment agreement shall also provide that the BROKER will be entitled to the rental commission from the Owner(s) in the event the Owner(s) rents the premises without using the BROKER or employs another broker for such purpose.

12. In the event the tenant purchases the real property described in the PDS during the term of the tenancy or the occupancy of the tenant the Owner(s) agrees to pay the BROKER the total commission set forth in paragraph 7 hereof.

**TERMS OF AGREEMENT**

13. This agreement shall commence on the date set forth below and shall terminate at midnight on ___1/2/2007___

**MISCELLANEOUS PROVISIONS**

14. Any notices required to be given under this agreement shall be in writing and may be given to the party by hand delivery of such notice or by ordinary mail.

15. ALL ORAL OR PRIOR AGREEMENTS BETWEEN THE PARTIES ARE HEREBY MERGED INTO THIS AGREEMENT AND THE PARTIES AGREE THAT THEIR RELATIONSHIP SHALL BE GOVERNED SOLELY BY THIS AGREEMENT AND NOT BY ANY OTHER PRIOR ORAL OR WRITTEN REPRESENTATIONS OR AGREEMENTS. The parties agree that no change, amendment, modification or termination of this agreement shall be binding on any party unless the same shall be in writing and signed by the parties hereto subsequent to the date of this agreement.

16. The Owner(s) understands and agrees that neither the Long Island Board of Realtors, Inc. nor the MLSLI are parties to this agreement and that the BROKER is not an agent for either of said organizations and has no authority to make any representation, agreement or commitment with respect to either of said corporations other than those contained in the printed portions hereof.

**ARBITRATION**

17. Any dispute between the parties, a subagent appointed pursuant to the authority granted by this agreement or a buyer's broker to whom the Seller(s) has agreed to pay compensation and arising out of this agreement where the amount in dispute is greater than six thousand ($6000) dollars shall be resolved by arbitration before one arbitrator. This paragraph shall not apply if all of the parties to such dispute are REALTORS. The arbitration shall be held in the county in which the real estate, which is the subject matter of this agreement, is located. The arbitration shall be governed by the rules of the National Arbitration and Mediation and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. Nothing herein contained is intended to deny any party, subagent or buyer's broker from applying to the Courts for injunctive relief such as is provided in CPLR 2701.

**ESCROW AND RECOVERY OF FEES**

18. If, for any reason, the BROKER is not paid the compensation set forth herein on the due date or there is a dispute concerning the payment of all or part of said compensation, the Owner(s) shall deposit with the Long Island Board of Realtors, Inc. an amount equal to the compensation set forth herein or the disputed amount, as the case may be, if the Owner's attorney is holding money in an escrow account to which the Owner is entitled, or over which the Owner has control, the Owner shall direct the attorney to make the deposit herein required to the extent of such monies. The said monies shall be held by the Long Island Board of Realtors, Inc. in escrow until the parties' rights to the escrow monies have been determined (i) by the written agreement of the parties, (ii) by an award of an arbitrator, (iii) by judgment or (iv) by some other process to which the parties agree in writing.

19. In any action, proceeding or arbitration to enforce any provision of this Agreement, including but not limited to its escrow provision, or for damages caused by default, the prevailing party shall be entitled to reasonable attorney's fees, costs and related expenses, such as expert witness fees, fees paid to investigators, fees paid to arbitration tribunals and arbitrator's fees. Paragraphs 18 and 19 hereof shall be deemed to be incorporated into the terms of any contract of sale executed by the Owner(s) with a buyer procured by BROKER, a subagent or a buyer's broker in their performance of this agreement.

**INDEMNITY**

20. In the event any claim or action is commenced against the BROKER or subagent as a result of the BROKER or subagent obeying the lawful instructions of the Owner(s), then, and in such event, the Owner(s) hereby agrees to defend, indemnify and hold harmless the BROKER or subagent in such claim or action.

**PROPERTY CONDITION DISCLOSURE**

21. The Seller is required by law to complete and sign a Property Condition Disclosure Statement and cause it, or a copy thereof, to be delivered to a buyer or buyer's agent prior to the signing by the buyer of a binding contract of sale.

22. A copy of the Property Condition Disclosure Statement containing the signatures of both the buyer and the seller must be attached to the real estate purchase contract.

23. If prior to closing or possession by the buyer the seller acquires knowledge which renders materially inaccurate a Property Condition Disclosure Statement previously provided, the seller must deliver a revised Property Condition Disclosure Statement to the buyer as soon as practicable.

24. If the seller fails to so deliver a Property Condition Disclosure Statement, the buyer will be entitled to a credit in the amount of $500 against the purchase price of the property upon the transfer of title.

**EXPLANATIONS**

25. An "**EXCLUSIVE RIGHT TO SELL**" listing means that if you, the Owner(s) of the property, find a buyer for your house, or if another broker finds a buyer, you must pay the agreed commission to the present broker.

26. An "**EXCLUSIVE AGENCY**" listing means that if you, the Owner(s) of the property find a buyer, you will not have to pay a commission to the broker. However, if another broker finds a buyer, you will owe a commission to both the selling broker and your present broker.

**EQUAL OPPORTUNITY IN HOUSING**

27. The parties agree that the above listed property is to be marketed in compliance with all Federal, State, Municipal and Local Laws concerning discrimination in housing.

[1] *Wherever the word broker is capitalized (BROKER) in this agreement, it is intended to describe the real estate broker who is a party and signatory to this agreement and no other broker.*

Owner Signature  X _____        Owner Signature  X _____   N.Y. 11375

Address  77-34  112TH STREET  #3C   FOREST HILLS

Home Phone  (718) 544-4006        Other Phone  (718) 544-4006

Date  7/12/2006        MLS Office Name  Weichert REALTORS F.H.

Listing Agent  Peter ANGECAS        Co-Listing Agent _____

MLS LI-C (04/2005)   ©Multiple Listing Service of Long Island, Inc.        PAGE 2 OF 2        Subsidiary of Long Island Board of Realtors, Inc.

**OWNER'S COPY**

# Exhibit 6

*Stephen S. Wan, MD, FACOG*

183 Centre Street, 5th floor
New York, NY 10013

Tel: (212) 625-9292
Fax: (212) 625-9099

02/15/07

Re: Ms. Jennifer Wang

To whom it may concern:

This is to certify that Ms. Jennifer Wang is 24 weeks pregnant with placenta previa. Her EDC is 06/11/07. She may start her maternity leave with effect from today. Thank you for your attention to this matter.

Sincerely,

Stephen Wan, MD

Stephen S. Wan, MD, P.L.L.C.
217 Grand Street, 2nd Floor
New York, NY 10013
Tel: 212-625-9292
Fax: 212-625-9099

# Exhibit 7

Case 1:07-cv-03715-AKH    Document 18-2    Filed 05/15/2007    Page 18 of 25



Skip navigation

**Medline** Plus
Trusted Health Information for You

A service of the U.S. NATIONAL LIBRARY OF MEDICINE
and the NATIONAL INSTITUTES OF HEALTH

Search MedlinePlus    About MedlinePlus | Site Map | FAQs | Contact Us

Home | Health Topics | Drugs & Supplements | Encyclopedia | Dictionary | News | Directories | Other Resources

## Medical Encyclopedia

Other encyclopedia topics:  A-Ag  Ah-Ap  Aq-Az  B-Bk  Bl-Bz  C-Cg  Ch-Co  Cp-Cz  D-Di  Dj-Dz  E-Ep  Eq-Ez  F  G  H-Hf  Hg-Hz  I-In  Io-Iz  J  K  L-Ln  Lo-Lz  M-Mf  Mg-Mz  N  O  P-Pl  Pm-Pz  Q  R  S-Sh  Si-Sp  Sq-Sz  T-Tn  To-Tz  U  V  W  X  Y  Z  0-9

## Placenta previa

Printer-friendly version    E-mail to a friend

**Contents of this page:**

- Illustrations
- Definition
- Causes, incidence, and risk factors
- Symptoms
- Signs and tests

- Treatment
- Expectations (prognosis)
- Complications
- Calling your health care provider
- Prevention

## Illustrations



Cesarean section



Ultrasound in pregnancy



Anatomy of a normal placenta



Placenta previa



Placenta



Ultrasound, normal fetus - arms and legs



Ultrasound, normal relaxed placenta



Ultrasound, color - normal umbilical cord



Placenta

## Definition    *Return to top*

Placenta previa is a condition that may occur during pregnancy when the placenta implants in the lower part of the uterus and is close to or covering the cervical opening to the vagina (birth canal).

## Causes, incidence, and risk factors    *Return to top*

Possible causes of placenta previa include a scarred endometrium (lining of the uterus), a large placenta, an abnormal uterus, or abnormal formation of the placenta. The incidence of placenta previa is approximately 1 out of 500 births.

The incidence increases with each pregnancy, and it is estimated that 1 in 20 women who have had 6 or more previous deliveries are at risk. The rate of placenta previa is doubled in multiple pregnancy (carrying more than one baby).

Risk factors include multiparity (previous deliveries), multiple pregnancy, previous myomectomy (removal of uterine fibroids through an incision in the uterus), and a previous C-section (if the scar is low and close to the vaginal cervix region).

**Symptoms**   *Return to top*

- Spotting during the first and second trimesters
- Sudden, painless, and profuse vaginal bleeding in pregnancy during the third trimester (usually after 28 weeks)
- Uterine cramping occurring with onset of bleeding

Note: Bleeding may not occur until after labor starts in some cases. Labor sometimes starts within several days after initial heavy, vaginal bleeding.

**Signs and tests**   *Return to top*

The uterus is usually soft and relaxed. The infant position is oblique ( // ) or transverse ( == ) in about 15% of cases. Fetal distress is not usually present unless a cord accident occurs, or vaginal blood loss has been heavy enough to induce maternal shock or placenta abruptio.

An abdominal ultrasound performed during the second trimester indicates low positioning of the placenta. Transvaginal or transperineal ultrasound can help physicians determine the position of a low-lying placenta.

**Treatment**   *Return to top*

The course of treatment depends on the amount of abnormal uterine bleeding, whether the fetus is developed enough to survive outside the uterus, the amount of placenta over the cervix, the position of the fetus, the parity (number of previous births) for the mother, and the presence or absence of labor.

Early in pregnancy, transfusions may be given to replace maternal blood loss. Medications may be given to prevent premature labor, prolonging pregnancy to at least 36 weeks. Beyond 36 weeks, the benefits of additional infant maturity have to be weighed against the potential for major hemorrhage.

Cesarean section is the method for delivery. It is the most important factor in reducing maternal and infant death rates.

**Expectations (prognosis)**   *Return to top*

The probable outcome is excellent when the condition is managed appropriately. This means hospitalizing those at risk who are having symptoms, and performing C-section delivery.

**Complications**   *Return to top*

Maternal complications include major hemorrhage (bleeding), shock, and death. The risk of infection and formation of blood clots (thromboembolism) also increases, as does the likelihood of the need for a blood transfusion.

Prematurity (infant is less than 36 weeks gestation) is responsible for about 60% of infant deaths in cases of placenta previa. Fetal blood loss or hemorrhage may occur because of the placenta separating from the wall of the uterus during labor. It may also occur with surgical entry into the uterus during a C-section delivery.

**Calling your health care provider**   *Return to top*

Call your health care provider if vaginal bleeding occurs at any point in the pregnancy. Placenta previa can endanger both the mother and the baby.

**Prevention**   *Return to top*

This condition is not preventable.

**Update Date: 8/19/2005**

Updated by: Sharon Roseanne Thompson, M.D., M.P.H., Clinical Fellow, Department of Obstetrics & Gynecology, Brigham and Women's Hospital, Boston, MA. Review provided by VeriMed Healthcare Network.

♥A.D.A.M.

A.D.A.M., Inc. is accredited by URAC, also known as the American Accreditation HealthCare Commission (www.urac.org). URAC's accreditation



program is the first of its kind, requiring compliance with 53 standards of quality and accountability, verified by independent audit. A.D.A.M. is among the first to achieve this important distinction for online health information and services. Learn more about A.D.A.M.'s editorial process. A.D.A.M. is also a founding member of Hi-Ethics (www.hiethics.com) and subscribes to the principles of the Health on the Net Foundation (www.hon.ch).

The information provided should not be used during any medical emergency or for the diagnosis or treatment of any medical condition. A licensed physician should be consulted for diagnosis and treatment of any and all medical conditions. Call 911 for all medical emergencies. Adam makes no representation or warranty regarding the accuracy, reliability, completeness, currentness, or timeliness of the content, text or graphics. Links to other sites are provided for information only — they do not constitute endorsements of those other sites. Copyright 2007, A.D.A.M., Inc. Any duplication or distribution of the information contained herein is strictly prohibited.

Home | Health Topics | Drugs & Supplements | Encyclopedia | Dictionary | News | Directories | Other Resources

Copyright | Privacy | Accessibility | Quality Guidelines
U.S. National Library of Medicine, 8600 Rockville Pike, Bethesda, MD 20894
National Institutes of Health | Department of Health & Human Services          Page last updated: 02 May 2007

# Exhibit 8

**Christopher Dysard**

| | |
|---|---|
| **From:** | Christopher Dysard |
| **Sent:** | Saturday, April 14, 2007 3:25 PM |
| **To:** | Stark, Tami S.; 'Lynch, Colleen K.' |
| **Cc:** | David Spears |
| **Subject:** | Genesis Healthcare Corp. (P-1414): Draft Agreement re: Interactive Brokers |
| **Attachments:** | SINY-#11666-v1-4-14-07_Draft_Attachment_A.DOC; SINY-#11665-v1-4-14-07_Draft_Agreement.DOC |

Tami and Colleen:
As promised, attached for your review please find a draft agreement between the SEC and Feng.  Please
understand that this is our first stab, and we reserve the right to revise the document further.  We look forward to
discussing this with you at your convenience.

Best regards,
Chris

Christopher Dysard
Spears & Imes LLP
51 Madison Avenue
New York, NY 10010
Direct Dial:  212 213-6833
Facsimile:  212 213-0849
cdysard@spearsimes.com

[DRAFT – 4/14/07]

**Agreement Between Zhiling Feng and the Securities and Exchange Commission
Relating to Interactive Brokers LLC Account No. U294563**

WHEREAS Zhiling Feng ("Feng") is the named account-holder of account

number U294563 at Interactive Brokers LLC (the "Account"); and

WHEREAS Feng and the Securities and Exchange Commission ("SEC") have

decided to enter into this Agreement for consideration known to each of them;

IT IS HEREBY AGREED AS FOLLOWS:

1.      Subject to Paragraph 2 below, no funds or securities shall be withdrawn

from or transferred out of the Account without the prior written consent of the SEC,

which shall be in the form of Attachment A to this Agreement;

2.      Nothing in Paragraph 1 above shall prevent Feng from engaging in

securities trades in the account;

3.      Feng may withdraw from this Agreement upon 60 days' written notice to

the SEC and to Interactive Brokers LLC, which notice shall attach a copy of this

Agreement.

4.      Immediately upon the execution of this Agreement by both parties, Feng

shall send to Interactive Brokers LLC a letter in the form of Attachment A to this

Agreement.


_____         _____
Zhiling Feng                              [ ]
                                          Securities and Exchange Commission

**[Draft – 4/14/07]**

## ATTACHMENT A

April __, 2007

[Interactive Brokers LLC
Compliance Department]

     Re:   <u>Interactive Brokers LLC Account No. U294563</u>

Dear Sir/Madam:

     I am the named holder of Interactive Brokers LLC Account No. U294563 (the "Account"). Consistent with the terms of the Agreement between Zhiling Feng and the Securities and Exchange Commission Relating to Interactive Brokers LLC Account No. U294563 (the "Agreement"), a copy of which is enclosed with this letter, effective immediately I direct you not to process any oral or written instruction to withdraw or transfer any funds or securities from the Account by anyone (including anyone purporting to act on my behalf), unless such a request is (i) made by me writing and (ii) accompanied by a written authorization executed by an officer of the Securities and Exchange Commission, which shall take the form of the enclosed Authorization.

     However, please note that, consistent with the Agreement, I remain free to engage in securities trades in the Account. Please also note that, consistent with the Agreement, I can withdraw from the Agreement upon 60 days' written notice to the Securities and Exchange Commission.

                    Yours very truly,

                    Zhiling Feng

(Enclosure)

cc:   Tami Stark, Esq.
       Branch Chief
       Division of Enforcement
       Securities and Exchange Commission
       Philadelphia District Office
       Mellon Independence Center
       701 Market Street
       Suite 2000
       Philadelphia, PA  19106-1532

11666.1/0133-00001

## AUTHORIZATION

[Date]

[Interactive Brokers LLC
Compliance Department]

      Re:   <u>Interactive Brokers LLC Account No. U294563</u>

Dear Sir/Madam:

      I am an officer of the Securities and Commission.  Pursuant to the procedure set forth in the April __, 2007 letter from Ms. Zhiling Feng (a copy of which is enclosed), I hereby authorize the enclosed instruction by Ms. Feng to [withdraw, transfer] [amount or securities] from Interactive Brokers LLC Account No. U294563.  Accordingly, please process Ms. Feng's instruction in the regular course.

                              Yours very truly,

                              [Officer]

(Enclosures)

cc:    Ms. Zhiling Feng
       David Spears, Esq.