DANIEL M. HAWKE
ELAINE C. GREENBERG
AMY J. GREER
KINGDON KASE
TAMI S. STARK (TS-8321)
COLLEEN K. LYNCH
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Philadelphia Regional Office
701 Market Street
Suite 2000
Philadelphia, PA  19106
Telephone: (215) 597-3100
Telefax: (215) 597-2740

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,    :

       Plaintiff,    :

       v.    :

JENNIFER XUJIA WANG, and RUBIN a/k/a    :
RUBEN a/k/a RUOPIAN CHEN,                :    Civil Action No.
                                         :    07 CV 3715 (AKH)

       Defendants,    :    ECF CASE

       and    :

ZHILING FENG,    :

       Relief Defendant.    :

---

## AMENDED COMPLAINT

       Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

## SUMMARY

1.    This matter involves an insider trading scheme perpetrated by Jennifer Xujia Wang ("Wang") and her husband, Rubin a/k/a Ruben a/k/a Ruopian Chen ("Chen") (collectively, "Defendants"), using brokerage accounts maintained in the name of Wang's mother, relief defendant Zhiling Feng ("Feng"), who resides in Beijing, China.  The Defendants, both of whom reside in the United States, generated at least $727,733 in illegal profits by trading securities based on material non-public information concerning impending corporate acquisitions that Wang, a U.S. resident, was privy to in her capacity as a Vice-President and manager of the Securitized Product Group at Morgan Stanley & Co., Inc. ("Morgan Stanley").

2.    Specifically, the Defendants, using two online brokerage accounts opened in Feng's name, purchased securities of various companies on the basis of material nonpublic information concerning proposed corporate acquisitions of those companies. In most instances, the Defendants generated their illegal profits by again trading in the securities of these companies once the news of their impending acquisition was made public.

3.    Wang had access to information concerning the acquisitions prior to its public release through her employment at Morgan Stanley and her work in support of the Morgan Stanley Division that had been contacted to provide financing to entities contemplating the acquisitions.  Based on the material non-public information obtained by Wang, the Defendants illegally traded in the securities of:  Town and Country Trust, prior to the December 19, 2005 public announcement that it was to be acquired by Morgan Stanley Real Estate; Glenborough Realty Trust, prior to the August 21, 2006

2

public announcement that is was to be acquired by Morgan Stanley Real Estate; Genesis HealthCare Corporation, prior to the January 16, 2007 public announcement that it had entered into an agreement to be acquired by Formation Capital, LLC and JER Partners; and Penn National Gaming, Inc., prior to the June 15, 2007 public announcement that it had entered into an agreement to be acquired by Fortress Investment Group LLC and Centerbridge Partners LP.  Defendants also traded in the securities of American Financial Realty Trust based on material non-public information that the company's management was considering an acquisition transaction, something the company's management ultimately chose not to pursue.

4.    By knowingly or recklessly engaging in the conduct described in this Complaint, Defendants violated, and unless restrained and enjoined, will continue to violate, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R.§ 240.10b5], thereunder.

5.    Relief defendant Feng is the record owner of the brokerage account that holds proceeds from the unlawful activities described herein, and is thereby unjustly enriched.  Feng is not charged herein with violating any provision of the federal securities laws.

6.    The Commission brings this action seeking to preliminarily and permanently enjoin the defendants from engaging in the wrongful conduct alleged herein.  The Commission also seeks a final judgment ordering the Defendants and relief defendant Feng to disgorge any ill-gotten gains and to pay prejudgment interest thereon, and ordering the Defendants to pay civil money penalties.

## JURISDICTION AND VENUE

7.    The Commission brings this action pursuant to Sections 21(d) and (e) of the Exchange Act [15 U.S.C. §§ 78u(d) and (e)], to enjoin such acts, practices, and courses of business; obtain disgorgement and civil penalties; and for other appropriate relief.

8.    This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].

9.    Certain of the acts, practices, and courses of business constituting the violations alleged herein occurred within the Southern District of New York and elsewhere, and were effected, directly or indirectly, by making use of the means and instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange.

## DEFENDANTS

10.    Jennifer Xujia Wang, age 31, is married to Chen and resides with him in Englishtown, New Jersey. From August 29, 2005 until June 10, 2007, Wang was employed by Morgan Stanley & Co., Inc. ("Morgan Stanley"), a registered broker-dealer and investment adviser, as Vice-President and manager of the Securitized Product Group, in a group referred to as the Valuation Review sub-department, which itself was a sub-department of the Financial Control department in Morgan Stanley's Finance Division ("Valuation Review Group"). On March 14, 2007, Wang refused Morgan Stanley's request to cooperate with its internal investigation relating to the matters alleged herein. That day, Wang, who was then pregnant and on disability leave, also alerted Morgan Stanley that she did not intend to return to work following the birth of her child. Morgan Stanley terminated her employment on June 10, 2007, following her arrest in connection with a criminal proceeding based largely on the same conduct alleged herein.

11.   <u>Ruben Chen</u>, age 34, currently resides with Wang in Englishtown, New Jersey.  From approximately July 18, 2005, until March 14, 2007, Chen was employed by ING Investment Management Services, LLC ("ING") in New York, New York, as a Vice-President of the Fund of Funds Department and the head of relative value hedge fund strategies.  In this role, he was associated with a subsidiary of ING, ING Alternative Asset Management LLC, which is a registered investment adviser.  On March 14, 2007, Chen resigned from ING after refusing the company's request that he cooperate with the firm's internal investigation of his trading.

## RELIEF DEFENDANT

12.   **Zhiling Feng**, age 59, is a Chinese citizen residing in Beijing, China.  She is Wang's mother.

## FACTS

### Wang's Employment Gave Her Access to Material Non-Public Information.

13.   In her position as Vice-President and manager of the Securitized Product Group, Wang managed financial analysts responsible for valuing certain assets of Morgan Stanley's Principal Transaction Group, which lends money to potential acquirers of commercial real estate assets by securitizing pools of loans.  Such potential acquirers of commercial real estate assets include Morgan Stanley Real Estate, real estate investment trusts, and private equity firms.

14.   As part of Wang's duties she had access to information disseminated to the Global Large Loan Committee ("GLLC") at Morgan Stanley.  Wang was added to the electronic mail distribution list for the GLLC on October 11, 2005.

15.   The GLLC evaluates and approves large loans, including those involving certain transactions related to purchases made by Morgan Stanley Real Estate, real estate investment trusts, and private equity firms.

16.   Information on the prospective deals evaluated by the GLLC group is tightly restricted. Wang was the only member of her unit with access to the information; not even her supervisor had access to the information.

17.   The GLLC periodically sent documents via electronic mail to employees with approved access, including Wang, that contained information on deals they were considering, in the form of meeting agendas and meeting minutes.

18.   In particular, Wang received minutes reflecting the project names for deals, detailed descriptions of the companies to be acquired, the amounts of the loans, and whether GLLC had approved the loans. Upon receiving meeting minutes reflecting that the loans had been approved, Wang knew that the deals were imminent.

19.   Two of the deals the GLLC considered and approved were potential acquisitions by Morgan Stanley Real Estate of Town and Country Trust ("Town and Country") and Glenborough Realty Trust ("Glenborough").

20.   As part of her employment, Wang also had access to a shared folder on Morgan Stanley's network drive called "Big loan," and to subfolders called "Gazelle," and "Polo." Access to these folders was restricted and Wang needed permission to obtain access because the "Big loan" folder contained information about pending loans for acquisitions and projects.

21.   The "Gazelle" subfolder contained information and the Principal Transaction Group's analysis for a transaction involving a potential acquisition of Genesis HealthCare

6

Corporation ("Genesis"); and the "Polo" subfolder contained information and the Principal Transaction Group's analysis for a transaction involving a potential acquisition of Penn National Gaming, Inc. ("Penn National").

22.    Wang was granted access to the "Big Loan" folder on October 26, 2006.

23.    Because Morgan Stanley owed a duty to maintain the confidentiality of information provided to it by its clients, in the policies and procedures it distributed to employees, Morgan Stanley included policies and procedures mandating that each employee maintain in strict confidence information concerning Morgan Stanley's clients. In addition, Morgan Stanley's policies prohibited employees from using confidential information obtained during the course of employment when trading in their own account, or someone else's account. As part of her employment application, Wang certified that she would abide by these policies and procedures.

24.    Based on the foregoing, Wang had a duty to maintain in confidence information about Morgan Stanley's Principal Transaction Group's evaluation of financing of potential acquisitions.

25.    Chen, who knowingly received from Wang confidential information about Morgan Stanley's Principal Transaction Group's evaluation of financing of potential acquisitions, also had a duty to maintain that information in confidence.

### Defendants Traded in Genesis Securities Based on Material Non-Public Information Concerning the Acquisition of Genesis.

26.    Genesis common stock trades on the NASDAQ Global Select Market under the ticker GHCI. Options on Genesis common stock trade on the Chicago Board Options Exchange ("CBOE") and other exchanges under the ticker QGR.

7

27.    Genesis, headquartered in Kennett Square, Pennsylvania, is one of the nation's
largest long-term care providers with nursing centers and assisted living residences in 13
states. During 2006, trading volume in Genesis averaged 203,000 shares per day and the
stock price averaged $45.

28.    On the morning of January 16, 2007, Genesis announced that it had agreed to
be acquired at a price of $63 per share by a joint venture between affiliates of two private
equity firms, Formation Capital, LLC and JER Partners. That announcement had a material
effect on the price and trading volume of Genesis common stock. On January 12, 2007, the
last trading day before the announcement, Genesis common stock closed at $52.85 per
share, on volume of 352,674 shares traded. On January 16, 2007, the Genesis common
stock closed at $61.26, on volume of 3,592,250 shares traded. Thus the stock price
increased by 15% and the volume increased by 919%.

29.    A customer account in the name "Zhiling Feng" held at Interactive Brokers,
LLC ("Feng Interactive Brokers Account") traded 570 options contracts on the common
stock of Genesis prior to the announcement of the Genesis acquisition.

30.    Wang and Chen controlled the Feng Interactive Brokers Account, and, from
December 29, 2006 through January 9, 2007, used it to purchase a total of 570 "call" option
contracts on Genesis at a total cost of $47,705. A call option contract gives the purchaser
the right to purchase 100 shares of stock at the strike price of the option on or before the
expiration date of the option. Wang and Chen subsequently sold all of the contracts on
January 16 and 17, 2007 for a total of $620,280. The approximate profit on these
transactions totaled $572,575, for an approximate return on investment of 1,200%.

31.    Wang's and Chen's Genesis options trades in the Feng Interactive Broker Account were out of the ordinary because, among other things, all but 74 of the call options contracts they purchased were "out-of-the-money."  A transaction is called "out-of-the-money" because the strike price of the call option is higher than the trading price of the underlying security at the time the contract was purchased.  The option contract can only be exercised profitably when the trading price of the underlying security rises above the strike price of the call option.

32.    For instance, the first purchase of Genesis stock options that Wang and Chen made in the Feng Interactive Brokers Account was for 30 call option contracts, purchased December 29, 2006, with a strike price of $55 per share and an expiration date of February 17, 2007.  This purchase conveyed the right to purchase 3,000 shares of Genesis stock at $55 per share on or before February 17, 2007.  Because Genesis stock traded no higher than $48.23 per share on the day that Wang and Chen bought the options, they were "out of the money."  Accordingly, if the stock price did not increase to $55 per share by February 17, 2007, the date of expiration, and the option was not sold prior to the expiration date, Wang and Chen would have lost all of the money they spent to purchase the option.

33.    Wang and Chen's trading in the Feng Interactive Brokers Account was also highly unusual because, among other things, options on Genesis stock trade relatively infrequently and the trades in the Feng Interactive Brokers Account represented a large portion of the total number of Genesis options contracts traded.

34.    For instance, for the 10 trading day period immediately prior to the January 16, 2007 acquisition announcement,

(a)    the 30 call option contracts with a strike price of $55 per share and an expiration date of February 17, 2007 purchased in the Feng Interactive Brokers Account represent 60% of all trading in that options series;

(b)    the 74 call option contracts with a strike price of $45 per share and an expiration date of January 20, 2007 purchased in the Feng Interactive Brokers Account represent 89% of all trading in that options series;

(c)    the 356 call option contracts with a strike price of $50 per share and an expiration date of January 20, 2007 purchased in the Feng Interactive Brokers Account represent 50% of all trading in that options series; and

(d)    the 110 call option contracts with a strike price of $55 per share and an expiration date of January 20, 2007 purchased in the Feng Interactive Brokers Account represent 27% of all trading in that options series.

35.    The Gazelle folder, to which Wang had access on the shared network drive, contained material non-public information showing the Principal Transaction Group's evaluation of Genesis.

36.    Morgan Stanley assumed a duty to maintain the information regarding the Genesis transaction in confidence.

37.    Telephone records provided by Chen's employer, ING, which details Chen's calling activity, show multiple calls exchanged between Chen's office line and Wang's work number at Morgan Stanley on December 29, 2006, the date the Feng Interactive Brokers Account first purchased Genesis options contracts.

38.    During the time period that directly correlates to the Genesis trading, every access to the Feng Interactive Brokers Account came from Internet Protocol ("IP") address

10

208.252.25.30, which is the IP address for ING Furman Selz Asset Management, now

known as ING Investment Management, Chen's employer.    An IP address individually

identifies a computer or network.

39.    Accordingly, Wang and Chen purchased Genesis securities while in

possession of material, nonpublic information regarding the Genesis acquisition, in breach

of a duty of confidentiality they owed to Morgan Stanley.

40.    By trading in Genesis securities on the basis of material, nonpublic

information in breach of duties of trust and confidence, Wang and Chen knowingly or

recklessly engaged in a device, scheme, artifice, transaction, act, practice or course of

business that operated as a fraud and deceit upon other persons.

### Defendants Traded in Glenborough Securities Based on Material Non-Public Information Concerning the Acquisition of Glenborough.

41.    Wang and Chen also used the Feng Interactive Brokers Account to illegally

trade in the common stock of Glenborough.  Glenborough common stock traded on the New

York Stock Exchange under the ticker GLB.

42.    Glenborough, headquartered in San Mateo, California, is a real estate

investment trust focused on owning high quality, multi-office properties concentrated in

Washington, DC, California and Northern New Jersey.  Before its acquisition in 2006,

trading volume in Glenborough averaged 276,401 shares per day, and the stock price

averaged $20.61.

43.    On August 16 and 18, 2006, Wang and Chen, through the Feng Interactive

Brokers Account, purchased 8,400 shares of Glenborough at an average price of $23.88 per

share.

44. On August 21, 2006, before the opening of trading, Glenborough announced it had agreed to be acquired by Morgan Stanley Real Estate for $26 per share.

45. Volume in the trading of Glenborough on August 18, 2006 was 257,600 shares traded, with a closing price of $24.03. On the next trading day, which was August 21, 2006, trading volume was 1,777,800 shares traded, or an increase in volume of 590%. The closing price on August 21, 2006 was $25.97, reflecting an 8% increase from the prior day's close.

46. The next day, August 22, 2006, Wang and Chen sold all of the Glenborough stock in the Feng Interactive Brokers Account for a profit of $17,283.

47. Wang received notices by electronic mail related to Morgan Stanley's involvement with the Glenborough deal. On August 16, 2006, the very same day that the Feng Interactive Brokers Account began to purchase Glenborough stock, Wang received by electronic mail GLLC minutes reflecting that GLLC had approved a large loan to finance "Project Gridiron," the project name for Glenborough, but that the approval of one more person was required and receipt of that approval was anticipated after the GLLC meeting.

48. These GLLC minutes describe "Gridiron" as a "publicly-traded office REIT" and state that the loan "will be secured by 65 properties comprising 6.5mm SF and primarily located in CBD and suburban markets of Washington, DC, California, New Jersey, Massachusetts, Florida, and Colorado." The minutes further state that "[t]he total acquisition cost for Gridiron will be about $1,862mm based on a $27.00 share price, a 15.7% premium to the current stock price of $23.33."

49. This information was material and nonpublic at the time that Wang received it and on August 16 and 18, 2006, when Wang and Chen, through the Feng Interactive Brokers Account, purchased shares of Glenborough.

12

50.    Because Glenborough was Morgan Stanley's client, Morgan Stanley assumed a duty to maintain the confidentiality of information concerning the Glenborough acquisition.

51.    Telephone records reveal that several calls were exchanged between Chen's phone line at ING and Wang's work number at Morgan Stanley on August 16, 2006.

52.    IP address access logs for the Feng Interactive Brokers account show the account was accessed from ING multiple times on August 16, 2006, August 17, 2006, August 18, 2006, August 21, 2006, and August 22, 2006.

53.    Accordingly, Wang and Chen purchased Glenborough securities while in possession of material, nonpublic information regarding the Glenborough acquisition, in breach of a duty of confidentiality they owed to Morgan Stanley.

54.    By trading in Glenborough securities on the basis of material, nonpublic information in breach of duties of trust and confidence, Wang and Chen knowingly or recklessly engaged in a device, scheme, artifice, transaction, act, practice or course of business that operated as a fraud and deceit upon other persons.

### Defendants Traded in Town and Country Securities Based on Material Non-Public Information Concerning the Acquisition of Town and Country.

55.    Town and Country, headquartered in Baltimore, Maryland, is a real estate investment trust that owns and operates apartment communities in the Mid-Atlantic States and Florida. Its stock was traded on the New York Stock Exchange under the symbol "TCT." In the six months prior to the announcement on December 19, 2005 that a group led by Morgan Stanley had agreed to buy the company, its stock traded mostly in the $27 to $31 range with average volume of 73,000 shares a day.

56.    On December 2, 2005, Wang received by electronic mail GLLC minutes reflecting that the GLLC approved a large loan to finance "Project Magazine" (the project name for Town and Country), but that it required the approval of one additional individual, expected the following week.

57.    These GLLC minutes describe "Magazine" as a "publicly-traded multifamily real estate investment trust," "self-administered and self-managed," and that "owns and operates a portfolio of multifamily properties in the Mid-Atlantic and Southeast." They further state that "the loan will be securitized by first mortgage lien on 39 predominantly Class B properties which include approximately 13,185 units."

58.    Wang received additional GLLC correspondence by electronic mail on December 7, 2005 reflecting that the additional individual was expected to approve the loans on December 8, 2005.

59.    This information was material and nonpublic at the time that Wang received it and on December 8 and 14, 2005, when Wang and Chen, through the Feng Interactive Brokers Account, purchased shares of Town and Country.

60.    Because Town and Country was Morgan Stanley's client, Morgan Stanley assumed a duty to maintain the confidentiality of information concerning the Town and Country acquisition.

61.    On December 8 and 14, 2005, Wang and Chen used an account in Feng's name at Scottrade, Inc. (the "Feng Scottrade Account") to purchase a total of 3,000 shares of Town and Country.

62.    On December 19, 2005, after the close of trading, Town and Country announced it had agreed to be acquired by Morgan Stanley Real Estate.

63.    On December 19, 2005, Town and Country stock closed at $29.79, on volume of 46,500 shares traded; on December 20, 2005, the first day of trading after the announcement, the stock closed at $33.75, on 1,895,700 shares traded.  As compared to December 19, 2005, trading at the close on December 20, 2005 reflected an increase in volume of 3,977% and an increase in the price per share of 13%.

64.    On December 23, 2005, Wang and Chen sold all 3,000 shares of Town and Country in the Feng Scottrade Account for a profit of $10,930.

65.    On January 23, 2006, Wang received by electronic mail GLLC minutes reflecting that "[a]nother suitor has offered a higher price per share" for Magazine and that now Morgan Stanley Real Estate was proposing to commit more money to the deal.

66.    This information was material and nonpublic at the time that Wang received it and on January 27, 2006, when Wang and Chen, through the Feng Interactive Brokers Account, purchased shares of Town and Country.

67.    On January 27, 2006, Wang and Chen used the Feng Scottrade Account to buy another 2,000 shares of Town and Country.

68.    On February 3, 2006, Wang received GLLC minutes by electronic mail reflecting that "GLLC approved increasing the loan amount based on a revised price of $40.00 per share."

69.    During the period February 2 through 9, 2006, there were multiple public announcements that Morgan Stanley Real Estate was involved in a bidding war for Town and Country.

70.    Between January 27 and February 9, 2006, Town and Country's stock price increased 19%.

71.    On February 9, 2006, Wang and Chen sold the 2,000 shares of Town and Country in the Feng Scottrade Account for a profit of $10,460.

72.    IP address access logs for the Feng Scottrade account show the account was accessed multiple times from the ING IP address during the period December 8, 2005 through February 9, 2006, the relevant Town and Country trading period.

73.    Accordingly, Wang and Chen purchased Town and Country securities while in possession of material, nonpublic information regarding the Genesis acquisition, in breach of a duty of confidentiality they owed to Morgan Stanley.

74.    By trading in Town and Country securities on the basis of material, nonpublic information in breach of duties of trust and confidence, Wang and Chen knowingly or recklessly engaged in a device, scheme, artifice, transaction, act, practice or course of business that operated as a fraud and deceit upon other persons.

75.    As a result of Wang's and Chen's illicit trading, they generated illegal profits totaling at least $611,248.

### Defendants Traded in Penn National Securities Based on Material Non-Public Information Concerning the Acquisition of  Penn National.

76.    Wang and Chen also used the Feng Interactive Brokers Account to illegally trade in securities of Penn National.  At all relevant times, Penn National common stock traded on NASDAQ under the ticker PENN, and options on Penn National common stock traded on the CBOE and other exchanges under the ticker UQN.

77.    At all relevant times, Penn National was headquartered in Wyomissing, Pennsylvania, and according to information publicly disseminated by the company in June 2007, operated casino and horse racing facilities with a focus on slot machine entertainment, including eighteen facilities in Colorado, Illinois, Indiana, Iowa, Louisiana, Maine,

Mississippi, Missouri, New Jersey, New Mexico, Ohio, Pennsylvania, West Virginia, and Ontario. Penn National reported net revenues of $2.3 billion during the twelve month period ended March 31, 2007.

78.    The "Big Loan" file that Wang had access to included information concerning the Principal Transaction Group's evaluation of a potential acquisition of Penn National by Fortress Investment Group LLC and Centerbridge Partners LP, under the code name "Polo." Among the documents included in the "Polo" sub-file in the "Big Loan" file was one with a file date of October 19, 2006, which set forth the terms of a proposed acquisition of Penn National, at $50 per share. While not specifically referring to the target company by its full name, the acquisition analysis refers to the target company as "Penn," includes both an income statement and cash flow statement of the target company that list by name and location the facilities operated by Penn National, including Penn National Slots in Pennsylvania, and lists the company's estimated net revenues for 2006 as approximately $2.3 billion.

79.    From October 27, 2006 though February 1, 2007, Wang and Chen, through the Feng Interactive Brokers Account purchased a total of 2,107 "call" option contracts in twelve separate series of options on Penn National common stock, at a total cost of $390,625. All of the contracts were sold from November 8, 2006 through February 20, 2007 for a total of $480,380. The approximate net profit on these transactions totaled $89,755 (two positions resulted in a loss). The gross profit on the profitable options positions was $97,830, for an approximate return on investment of 27%.

80.    On June 15, 2007, before the opening of trading, Penn National announced it had agreed to be acquired by certain funds managed by affiliates of Fortress Investment Group LLC and Centerbridge Partners LP for $67 per share.

81.    During the 90 days prior to the announcement of the Penn National Gaming deal, its stock traded from $41.86 to $54.38 on average volume of 1,121,000 shares. The day before the announcement, the closing price was $51.14 on volume of 730,493 shares. On the day of the announcement, the closing price was $62.12 on volume of 11,059,569 shares. The one-day increase in price was 21.5% and the increase in volume was 1,414%.

82.    Morgan Stanley assumed a duty to maintain the information regarding the Penn National transaction in confidence. This information was material and nonpublic at the time that Wang had access to it, and from October 2006 through February 2007, when Wang and Chen, through the Feng Interactive Brokers Account, traded options in Penn National.

83.    Accordingly, Wang and Chen purchased Penn National securities while in possession of material, nonpublic information regarding the Penn National acquisition, in breach of a duty of confidentiality they owed to Morgan Stanley.

84.    By trading in Penn National securities on the basis of material, nonpublic information in breach of duties of trust and confidence, Wang and Chen knowingly or recklessly engaged in a device, scheme, artifice, transaction, act, practice or course of business that operated as a fraud and deceit upon other persons.

**Defendants Traded in AFR Securities Based on Material Non-Public
Information Concerning a Proposed Management Leveraged Buy-Out of AFR.**

85.    Wang and Chen also used the Feng Interactive Brokers Account to illegally

trade in the common stock of AFR.  At all relevant times, AFR common stock traded on the

New York Stock Exchange under the ticker AFR.

86.    AFR, headquartered in Jenkintown, Pennsylvania, is a real estate investment

trust focused on acquiring, managing, and operating properties leased primarily to regulated

financial institutions, primarily banks.  The company maintains offices in Philadelphia,

Pennsylvania and Charlotte, North Carolina.

87.    On June 22, 2006, the GLLC approved a $2.9 billion loan to a management

team from AFR, which was to be used to finance a leveraged buy-out of AFR.  The GLLC

minutes from June 22, 2006 that Wang had access to refer to the transaction using the code

name "Patriot," and describe the target company (*i.e.*, AFR) as "a publicly traded

commercial real estate investment trust."

88.    Beginning on June 22, 2006, the same day the GLLC approved the loan to

finance the management buy-out of AFR, though June 30, 2006, Wang and Chen, through

the Feng Interactive Brokers Account, purchased 15,000 shares of AFR at an average price

of $9.37 per share.  From July 6, 2006 through July 19, 2006, Wang and Chen, through the

Feng Interactive Brokers Account, purchased an additional 12,250 shares of AFR at an

average price of $10.62 per share, and sold 10,300 shares at an average price of $10.63,

leaving a balance of 16,950 shares of AFR in the Feng Interactive Brokers Account at the

end of July 2006.  From August 8, 2006 through August 17, 2006, Wang and Chen, through

the Feng Interactive Brokers Account, purchased an additional 28,650 shares of AFR at an

average price of $11.61 per share.  During the same period, they sold all of their remaining

AFR shares, which totaled 45,600 shares, at an average price of $11.43 per share. Wang
and Chen generated a total profit of $18,655 based on their trades in AFR stock through the
Feng Interactive Brokers Account during July and August 2006.

89. The acquisition of AFR, in the form approved by the GLLC in June 2006, was
never consummated. On November 5, 2007, AFR announced that it had entered into an
agreement to be acquired by Gramercy Capital Corporation for approximately $3.4 billion.

90. Morgan Stanley assumed a duty to maintain the information regarding the
proposed AFR transaction in confidence. This information was material and nonpublic at
the time that Wang had access to it, and in July and August 2006, when Wang and Chen,
through the Feng Interactive Brokers Account, traded in shares of AFR.

91. Accordingly, Wang and Chen purchased AFR securities while in possession of
material, nonpublic information regarding the proposed AFR acquisition, in breach of a duty
of confidentiality they owed to Morgan Stanley.

92. By trading in AFR securities on the basis of material, nonpublic information in
breach of duties of trust and confidence, Wang and Chen knowingly or recklessly engaged
in a device, scheme, artifice, transaction, act, practice or course of business that operated as
a fraud and deceit upon other persons.

### The Evidence Shows That Chen and Wang Exercised Control Over Feng's Brokerage Accounts.

93. On February 2, 2004, Wang and Chen opened the Feng Scottrade Account.
There were only two deposits to the Feng Scottrade Account: the first was the initial
deposit of $40,000 to open the account in March 2004; and the second was a deposit of
$50,000 in March 2005. Both deposits were made by check. Scottrade only possessed a
copy of the first check, which was from a Bank of China bank account held by Wang and

Chen in a New York, New York, branch. In the account opening application, Feng was identified as living in Beijing, China, "retired," with an estimated net worth of $500,000 and an annual income of $10,000. The application stated that Feng had at least 8 years experience trading options and 10 years trading stocks.

94.    On May 5, 2006, Wang and Chen opened the Feng Interactive Brokers Account. On May 7 and 12, 2006, a copy of Feng's passport and a utility bill was faxed to Interactive Brokers from a fax at Morgan Stanley to which Wang had access. In June 2006, the Feng Scottrade Account was closed, and $27,626 in cash and $107,275 in equities were transferred to the Feng Interactive Brokers Account. This was the only deposit made to the Feng Interactive Brokers Account.

95.    The IP addresses used to log into the Feng online brokerage accounts show that Chen and/or Wang placed the trades in the accounts. Most of the IP addresses originate from the New York metropolitan area and none of the IP addresses used for the relevant trading originate from China.

96.    Over 60% of the logins to the brokerage accounts originated from an IP address registered by a company called "ING Furman Selz Asset Management," currently operating under the name of ING. When Chen logged into an online account from the computer in his office, this ING IP address would be identified. Another IP address used to log into the accounts originates from Wang and Chen's home in New Jersey. Some of the IP addresses were associated with hotels, such as: the Palace in San Francisco and the Fairmont Royal York in Toronto. Chen stayed at the Palace in San Francisco on the date when Feng's account was accessed from the Palace's IP address.

97.    Chen and Wang did not disclose to their employers that they used or controlled the Feng accounts.  ING required Chen to disclose all brokerage accounts in which he could buy or sell securities.  Similarly, Morgan Stanley required Wang to disclose any brokerage accounts in which she had a financial interest.  Although both Wang and Chen disclosed to their employers that they had accounts away from their employers in Chen's name, they did not disclose the Feng accounts.  Further, ING required Chen to pre-clear any trading and he did not pre-clear the trades at issue here.

## FIRST CAUSE OF ACTION

**Violations of Section 10(b) of the Exchange Act
and Rule 10b-5 thereunder by Wang and Chen**

98.    The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 97, inclusive, as if they were fully set forth herein.

99.    From at least December 2, 2005, and continuing through the present time, Wang and Chen, knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly by use of the means or instrumentality of interstate commerce or of the mails, or a facility of a national securities exchange:

    (a)    employed devices, schemes or artifices to defraud;

    (b)    made untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    (c)    engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

100. By engaging in the foregoing conduct, Wang and Chen violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R.§ 240.10b5], thereunder.

## SECOND CAUSE OF ACTION

### Unjust Enrichment by Feng

101. The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 100, inclusive, as if they were fully set forth herein.

102. As described above, Feng is the record owner of brokerage accounts that hold proceeds generated by the unlawful activities described herein, and it is not just, equitable or conscionable for Feng to retain those funds.

**WHEREFORE**, the Commission respectfully requests that this Court:

### I.

Permanently restrain and enjoin defendants Wang and Chen, and their agents, officers, servants, employees, attorneys, and those persons in active concert or participation with them, directly or indirectly, singly or in concert, from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R.§ 240.10b5], thereunder.

### II.

Order defendants Wang and Chen to account for and to disgorge any and all ill-gotten gains, together with prejudgment interest, derived from the activities set forth in this Complaint, in accordance with a plan of disgorgement acceptable to the Court and to the Commission.

### III.

Order defendants Wang and Chen to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C.§ 78u(d)(3)], in an amount to be determined by the Court.

### IV.

Order relief defendant Feng to disgorge all unlawful proceeds as described herein, together with prejudgment interest.

### V.

Grant such other and further relief as the Court may deem just and appropriate.

Respectfully submitted,

Daniel M. Hawke
Elaine C. Greenberg
Amy J. Greer
Kingdon Kase
Tami S. Stark  (TS-8321)
Colleen K. Lynch

Attorneys for Plaintiff

**SECURITIES AND EXCHANGE COMMISSION**
Mellon Independence Center
701 Market Street, Suite 2000
Philadelphia, PA  19106
Telephone: (215) 597-3100
Facsimile: (215) 597-2740

Dated: July 2, 2008